# TAB 4

LEXSEE 2002 U.S. DIST. LEXIS 10276, 27-28

**RICHARD KING, JR., Plaintiff, v. CITY OF PHILADELPHIA, Defendant**

CIVIL ACTION NO. 99-6303

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2002 U.S. Dist. LEXIS 10276*

**June 4, 2002, Decided**

**SUBSEQUENT HISTORY:** *Affirmed by King v. City of Philadelphia, 2003 U.S. App. LEXIS 6290 (3d Cir. Pa., Apr. 1, 2003)*

**PRIOR HISTORY:** *King v. City of Philadelphia, 2002 U.S. Dist. LEXIS 1459 (E.D. Pa., Jan. 31, 2002)*

**DISPOSITION:** Defendant's motion for summary judgment was granted. Judgment was entered in defendant's favor and all claims against defendant were dismissed with prejudice.

**COUNSEL:** [*1] For RICHARD A. KING, JR., PLAINTIFF: ISAAC H. GREEN, JR., PHILA, PA USA. ADRIAN J. MOODY, MOODY AND ANDERSON, P.C., PHILADELPHIA, PA USA. OLUGBENGA O. ABIONA, PHILADELPHIA, PA USA. RICHARD A KING, JR., PHILADELPHIA, PA USA.

For CITY OF PHILADELPHIA, DEFENDANT: TREMELLE T. HOWARD, CITY OF PHILA., LAW DEPT., PHILA, PA USA. DONNA G. MARSHALL, CITY OF PHILADELPHIA LAW DEPARTMENT, ASSISTANT CITY SOLICITOR, PHILADELPHIA, PA USA. PETER D. WINEBRAKE, CHIEF DEPUTY CITY SOLICITOR, CITY OF PHILA LAW DEPT, PHILADELPHIA, PA USA. FRANK CONLEY, PHILADELPHIA, PA.

**JUDGES:** JAMES T. GILES, C.J.

**OPINIONBY:** JAMES T. GILES

**OPINION:**

### MEMORANDUM

Giles, C.J.

June 4, 2002

### I. Introduction

On December 10, 1999, Richard King, who is black, filed a complaint against the City of Philadelphia seeking compensatory damages and attorney's fees. n1 The complaint alleges causes of action for employment discrimination under Title VII, *42 U.S.C. §§ 2000e-2(a)(1)-(2), 2000e-3* (Counts I-II), and under *42 U.S.C. § 1983*, for violations of the First and Fourteenth Amendments (Count III), and the Due Process Clause of the Fifth and Fourteenth Amendments (Count IV). The City [*2] moved for summary judgment. For the reasons that follow, that motion is granted.

> n1 At the hearing on the City's motion for summary judgment on April 4, 2002, Mr. King, for the first time verbally, sought injunctive relief in the form of reinstate as a police officer.

### II. Factual Background

The facts in the light most favorable to the non-moving party are as follows:

*A. Employment History*

In July 1993, plaintiff became a police officer with the City's Police Department. Initially, he worked in the 22nd Police District as a patrol officer. Later, in 1996, he was temporarily transferred to the Differential Police Response Unit ("DPR Unit"). He worked in the DPR Unit for one year before returning to the 22nd Police District. While in the DPR Unit, he reported directly to Corporal Thomas Woltemate. The commanding officer of the DPR Unit was Lieutenant Ludd who is black. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., King Aff. PP 1-2.)

Sometime in December 1996, Corporal Woltemate and Corporal Stewart, [*3] both white, allegedly used a racial epithet referring to Mr. King. (Id. P 3.) He complained to Lieutenant Ludd. When he felt that

Case 1:05-cv-00178-SLR    Document 51-6    Filed 04/10/2006    Page 3 of 14

Page 2
2002 U.S. Dist. LEXIS 10276, *3

no action was taken about his complaint, Mr. King contacted the Equal Employment Opportunity Officer of the Philadelphia Police Department, Sergeant Bond ("EEO Officer"), who discussed the matter with Corporal Woltemate. (Id.)

While in the DPR Unit, plaintiff received unsatisfactory performance evaluations from Corporal Woltemate. These evaluations were approved by Lieutenant Ludd. (Id. P 4.)

### B. Plaintiff's Disciplinary History

After being transferred to the DPR Unit, plaintiff began receiving disciplinary citations. A summary of plaintiff's relevant suspensions follows: (1) a fifteen-day suspension for insubordination, neglect of duty, and disobedience of orders in 1997 (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 13); (2) a thirty-day suspension for conduct unbecoming an officer in 1998 (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 11); and (3) a ten-day suspension for insubordination and neglect of duty in 1998. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. K.)

#### 1. The Fifteen-Day Suspension

In 1997, [*4] Mr. King received a fifteen-day suspension because he failed to report to work on August 1, 1996, had reported two hours late for duty on August 7, 1996, and on January 27, 1997 had failed a sick-check, that is when officers went to his home plaintiff was not there as he should have been. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 30.) It is not disputed that each of these actions violated either Police Directive 66, which governs the use of sick time by police officers, or the Philadelphia Police Department Disciplinary Code. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Exs. E, F.)

Lieutenant Ludd recommended disciplinary action against Mr. King. The Captain of the DPR Unit made a formal request for discipline to the Police Commissioner. This resulted in a hearing before the Police Board of Inquiry ("PBI") on charges of insubordination, neglect of duty, and disobedience to orders. (Id., Ex. C, Ludd Aff. PP 9-12.) Mr. King had legal representation at the hearing.

The PBI was comprised entirely of officers independent of the units where Mr. King worked. That PBI recommended that he receive a fifteen-day suspension. The Police Commissioner adopted the PBI's [*5] recommendation. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 13.)

#### 2. The Thirty-Day Suspension

In January 1998, Mr. King received a thirty-day suspension after the Police Department received information that he had been involved in an off-duty traffic accident where he persuaded the other driver not to report the accident by agreeing to accept financial responsibility for damage to that driver's vehicle. When Mr. King failed to pay as promised, the driver's family contacted the Internal Affair's Division of the Police Department ("IAD") to complain that Mr. King never paid for the damage to their car. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. I.) After investigation, the IAD concluded that Mr. King had acted improperly. The matter was referred to the PBI for a hearing. Mr. King again was represented by counsel. The PBI concluded that Mr. King's conduct was unbecoming an officer in violation of Police Department Disciplinary Code. Mr. King was suspended for thirty days consistent with the PBI's recommendation of discipline. (Id., Ex. H.)

#### 3. The Ten-Day Suspension

Lieutenant Ludd made another request for disciplinary action against Mr. King on [*6] September 9, 1997, since he failed to report to work on September 1, 1997. He had been denied this day off by a superior officer, but then resubmitted the same request to a subordinate corporal without informing him that the request had earlier been denied by the corporal's superior officer. The corporal covering the holiday weekend, who had no authority under such circumstances, granted the request without knowing it had previously been denied by his supervisor. (Id., Ex. C, Ludd Aff. PP 13-15.)

On October 15, 1997, the commanding officer of the 22nd Police District filed a request with the Police Commissioner for disciplinary action against Mr. King. Again, a PBI hearing was held and he was represented by counsel. (Id., Ex. 37.) The PBI hearing board found that plaintiff had violated specific sections of Directive 66 and the Police Disciplinary Code. In March 1998, he received notice that he was suspended for ten days for neglect of duty and insubordination for the September 1, 1997 incident, consistent with the PBI's recommendation of discipline. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J., Ex. K.).

### C. The EEOC Claim

On August 8, 1997, Mr. King filed a charge of race [*7] discrimination and harassment against the City with the EEOC charging that he was subject to a racially hostile work environment. The EEOC had notified the City of his race discrimination charge by August 29, 1997.

On October 20, 1997, he filed a complaint with the EEO office of the Philadelphia Police Department alleging that Lieutenant Ludd strictly enforced depart-

Case 1:05-cv-00178-SLR   Document 51-6   Filed 04/10/2006   Page 4 of 14

Page 3
2002 U.S. Dist. LEXIS 10276, *7

ment rules and regulations to target plaintiff in retaliation for filing discrimination complaints with the EEOC and with the Police Department's EEO officer. On December 15, 1997, Captain Deborah Mateffy of the Internal Affairs Department completed an investigatory report on his complaint that he had been retaliated against for filing a discrimination complaint. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 40.) On January 27, 1998, Police Commissioner Richard Neal informed Mr. King that the allegations of retaliation were found not to be substantiated. (Id., Ex.1.) On June 9, 1998, plaintiff filed a charge of retaliation with the EEOC. (Compl. at PP 5-7.) On August 2, 1999, he requested a Notice of Right to Sue for both charges. (Id.)

### D. The Report of Burglary of Plaintiff's Home

On February 28, 1998, while [*8] serving the thirty-day suspension, Mr. King called the Police Radio Unit to report that his home had been burglarized. Officer Willie Williams, who is black, was the first officer on the scene. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss, Ex. T, Arbitrator's Opinion at 9.) Officers Cheryl Jackson and Cheryl Brown, both black, also responded to the call. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 61 at 10.) Officers Clyde Williams, a black officer, and Michael Harvey initially investigated the burglary. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 4.)

Detective Thomas Gaul was assigned to the burglary investigation. At the crime scene he and Officer Harvey both became suspicious that the claimed burglary had been staged. They came to that conclusion because a brick a few feet from the house that Mr. King said had been used to break the utility room window, the alleged point of entry into the home, had to have been thrown from inside the house because it ended up outside. The officers also noted that the glass shards with the brick on the outside of the home, and no glass shards inside the utility room, were consistent with a brick being thrown from [*9] within the house. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss., Ex. T, Arbitrator's Opinion at 5, 8.)

When Detective Gaul pointed out to Mr. King the reasons that he thought the utility window was not the means of entry, Mr. King led the investigating officers to an outside door near the bedroom. He stated, for the first time, that the door had been closed when he left, but that it was open when he returned home. Detective Gaul and Officer Harvey found that this door was taped shut with weatherizing tape and there was no evidence that it had been opened for months. Even when Mr. King tried to open the door, he had to pull several times. (Id.)

The officers further found it troubling that after itemizing the missing articles from his home as a picture, a television, a VCR, and stereo equipment, Mr. King stated to Officer Harvey "Oh yes, by the way, they took my gun," referring to his service revolver. The officers at the scene thought that "it was unusual that [Mr. King] mentioned his weapon almost as an afterthought since in the wrong hands it could cause a serious problem." (Id. at 6-7.)

Detective Gaul decided to consult with a commanding officer about his suspicions and [*10] told Mr. King that he would return with a lieutenant. When the officers returned they found that the brick and glass shards, which Detective Gaul previously had recorded as being outside of the window, were now inside the utility room approximately four to six inches from the wall below the window. The closeness of the brick to the wall, without evidence that it had hit another wall or machine in the utility room, was inconsistent with the brick having been thrown from outside the house. When Detective Gaul questioned the presence of the brick and glass inside the utility room, Mr. King maintained that they had always been there. (Id. at 6.)

Detective Gaul called the Mobile Crime Unit to process the scene. Police Officer Taggert and civilian Mujica of the Mobile Crime Unit concurred with the investigating officers that the window which plaintiff reported as the point of entry into the home was broken from the inside. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss., Ex. 46, Internal Investigation Report at 2.)

### E. The Arrest of William Tarrance

A few days later, plaintiff caused a personal friend, William Tarrance, to be arrested. Mr. King reported to police officers that [*11] he had spotted Mr. Tarrance in a WAWA parking lot carrying a black backpack that he believed had been taken in the burglary. Mr. King claimed that when he called out to his friend, Mr. Tarrance fled down the street and jumped on a bus. (Id. at 3.) Mr. King followed the bus in his private car until he saw a police officer and flagged him down. After explaining that Mr. Tarrance had a backpack taken during the burglary of his home, Mr. King convinced the police officer to stop the SEPTA bus on which Mr. Tarrance was riding and place him under arrest on the strength of his accusation. (Id., Ex. 22, Statement of William Tarrance.)

After being handcuffed and removed from the bus, Mr. Tarrance was interviewed at the North Detective Division. He told the officers that he had known Mr. King for almost ten years and that Mr. King had given him the bag at issue during the previous summer when Mr. Tarrance was helping Mr. King move. (Id., Ex. 46, Internal Investigation Report at 3.) On the day that Mr. King had him arrested, Mr. Tarrance stated that early in the morning he saw Mr.

Case 1:05-cv-00178-SLR    Document 51-6    Filed 04/10/2006    Page 5 of 14

Page 4
2002 U.S. Dist. LEXIS 10276, *11

King on Germantown Avenue near the WAWA store. Mr. Tarrance got into Mr. King's car and he told Mr. Tarrance about [*12] the burglary while they drove around to Mr. King's house and then back to the WAWA on Germantown Avenue. Mr. Tarrance exited the car and went into the store to buy a sandwich. After making his purchase, Mr. Tarrance had to run to catch the bus. (Id.) The police investigators ultimately concluded that Mr. King's allegation regarding theft of the backpack by Mr. Tarrance was fabricated and that Mr. King had caused them to arrest Mr. Tarrance wrongfully.

### F. The Arrest of Richard King

Detective Richard Prendergast assisted Detective Gaul with the burglary investigation. Believing that there was probable cause to arrest Mr. King for staging a burglary and causing an innocent person to be arrested, Detective Prendergast prepared an affidavit which was submitted to the District Attorney's Office. It recommended plaintiff's arrest on probable cause of committing the crimes of making false reports to law enforcement, *18 PA. CONS. STAT. ANN. § 4906*, and obstructing the administration of law, *18 PA. CONS. STAT. ANN. § 5101*. The detective's affidavit related the bases for probable cause as follows: (1) when Detective Gaul returned to the crime scene, a brick which allegedly was used to [*13] break the window and glass shards were on the inside of the house even though this brick and glass had been on the outside of the house when the scene was initially checked; (2) Police Officer Taggert and civilian Mujica of the Mobile Crime Unit, who responded to Mr. King's residence, concurred with Detective Gaul that the window in which Mr. King reported entry was gained, was broken from the inside; (3) Mr. King caused Mr. Tarrance to be arrested for possessing a backpack allegedly taken in the burglary, whereas, Mr. Tarrance gave a credible account that plaintiff had given him the backpack during the summer when Mr. Tarrance had helped Mr. King move. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J., Ex. 6.) The affidavit also stated that "investigation revealed that Richard King was just finishing a 30 day suspension when this burglary was reported. King has been charged numerous times by the Police Depart. for Departmental violations including Conduct Unbecoming an Officer, Insubordination and Neglect of Duty." (Id.) A plausible motive for a police officer to stage a burglary is to cover up for a service revolver lost or stolen at another location and not in the line of duty, [*14] a serious infraction under any circumstances and, especially for an officer with a disciplinary record.

Assistant District Attorney Martelli and Deputy District Attorney Harley, persons separate from the Police Department, to whom alleged police department bias cannot be imparted, approved the conclusion that there was, in fact, probable cause to seek an arrest warrant against plaintiff. (Id., Ex. 46, Internal Investigation Report at 4.) Bail Commissioner Dwain Hill, likewise separate from the police department, heard the evidence against Mr. King and signed a warrant for his arrest. (Id.) Mr. King was arrested on April 2, 1998. Because of the fact of the arrest, he was terminated on May 1, 1998. (Id., Exs. 7, 9.) It is undisputed that the City has a policy of automatically terminating any police officer who is arrested, regardless of whether the criminal charges are subsequently dropped, or of the officer is found not guilty, and of reinstating the officer only if there is an arbitration decision in favor of the disciplined officer. (Mem. in Supp. of Def.'s Mot. for Summ. J., Ex. S, Norris Aff. PP 4-6.) The arbitration decision rendered on February 16, 2000 was not in Mr. King's [*15] favor. (Id., Ex. T, Arbitrator's Opinion)

The Internal Affairs Division also conducted an investigation into the burglary incident and the arrest of Mr. Tarrance. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 46.) On July 6, 1998, two days before the final investigation report by the IAD was prepared, City police officers found Mr. King's gun in the possession of an apparently unrelated person arrested after a traffic stop. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J. at 4.) On or about July 20, 1999, the District Attorney's Office decided not to prosecute the case. (Id., King Aff. P 14.)

### G. The Arbitration Hearing

Mr. King filed a grievance objecting to his dismissal pursuant to a collective bargaining agreement between the City and the police union. This grievance process culminated in a full-day arbitration on November 1, 1999 before a neutral arbitrator assigned by the American Arbitration Association. Mr. King had legal representation. On February 16, 2000, the arbitrator upheld the dismissal action and issued a twenty-one page opinion finding that there was "just cause" for the dismissal. The arbitrator found that the City had met the standard [*16] of proof of clear and convincing evidence in concluding that there was probable cause to arrest plaintiff and that there was a valid nexus between the off-duty conduct and the employer's business. n2 (Def.'s Mem. of Law in Supp. of Mot. to Dismiss., Ex. T., Arbitrator's Opinion at 12-13, 20.)

> n2 The arbitrator stated that the "existence of the required nexus between [Mr. King's] conduct and his employment as a police officer is clear. [Mr. King] knowingly engaged in conduct intended to mislead his fellow officers during an official investigation which necessarily undermines his credibil-

ity and the confidence of his peers. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss., Ex. T. Arbitrator's Opinion at 21.)

## II. The Arbitrator's Opinion

The arbitrator found Mr. King's testimony at the arbitration hearing to be incredible while finding the testimony of the investigating and arresting police officers to be consistent and credible. Specifically, the arbitrator concluded that Mr. King's testimony surrounding [*17] his missing service revolver was materially inconsistent with the testimony of the investigating officers. (Id. at 18.) Mr. King testified that he told Officer Willie Williams that his service weapon was missing before entering his home with any officer. (Id.) Officer Williams testified, however, that he asked Mr. King about his service weapon after he and Mr. King already had entered plaintiff's home to determine what was missing and plaintiff was identifying other items. (Id.) Similarly, Officer Harvey testified that he found it strange that when plaintiff identified the missing items, he mentioned his service revolver "almost as an afterthought." (Id.)

The arbitrator found that Officer Harvey and Detective Gaul each independently concluded that the brick had to have been thrown from inside the house and that there was no point of entry for the burglary. (Id. at 19.) Officer Harvey and Detective Gaul testified that the door which Mr. King claimed had been open, and could have been the point of entry for the burglary, was sealed with weatherizing tape, required several tugs by plaintiff to open, and appeared not to have been opened for months. (Id. at 5, 20.)

Also, the arbitrator [*18] did not credit Mr. King's testimony that the outside door next to the bedroom was closed when he left the house on February 27, 1998, and was open when he returned on February 28, 1998. (Id. at 19-20.) The arbitrator found plaintiff's testimony about the door internally inconsistent. While plaintiff stated that the door was open when he returned to his house, his testimony was to the effect that he never shut the door before the officers arrived; yet, the door was sealed with tape when the officers investigated the house. (Id. at 20.) Further, the arbitrator concluded that to credit Mr. King's testimony about the window and door would mean that Officer Harvey and Detective Gaul had fabricated theirs. Since these officers did not know him before the incident, Mr. King established no motive for them to lie. (Id. at 20.)

As to Mr. Tarrance's testimony that the backpack that Mr. King accused him of stealing had been given to him by Mr. King the previous year as well his version of the events before he was arrested, the arbitrator found Mr. Tarrance to be credible and Mr. King's testimony to be "vague and unresponsive." (Id. at 18.) The arbitrator noted that Mr. King could not remember [*19] whether it was before or after he saw Mr. Tarrance at WAWA that he discovered that the backpack was taken in the alleged burglary. (Id.) In addition, Mr. King did not dispute Mr. Tarrance's version of what occurred when he was asked directly whether Mr. Tarrance's account of their meeting at WAWA was accurate. (Id. at 18.) Finally, the arbitrator also concluded that Mr. Tarrance, a friend of Mr. King, had no reason to lie. (Id. at 3.)

The arbitrator concluded that there was no evidence that the City relied on Mr. King's prior disciplinary record as a basis for his termination. (Id. at 16.) Detective Prendergast testified that his sole reason for considering plaintiff's disciplinary record was to assess his character and credibility. (Id. at 17.) The arbitrator emphasized that he also did not rely on Mr. King's prior disciplinary record in finding that the City had "just cause" for his termination. (Id.)

The City now argues that Counts I-III should be dismissed under summary judgment standards because plaintiff cannot rebut defendant's legitimate non-discriminatory reasons for his termination as well as the disciplinary actions against him; that Count IV, the Fifth Amendment and [*20] Fourteenth Amendment due process claims, should be dismissed as a matter of law because the Fifth Amendment does not apply to municipalities and the record amply shows that plaintiff received all of the due process to which he was entitled under the Fourteenth Amendment; and, finally, that plaintiff cannot meet the standards for municipal liability under *42 U.S.C. § 1983*. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J at 1-2.) For the reasons discussed below, all claims against defendant are dismissed with prejudice. n3

> n3 As his response to the City's motion for summary judgment, plaintiff submitted a brief consisting of unsubstantiated allegations plus two volumes of exhibits, which plaintiff seems to suggest might contain somewhere therein an issue of material fact sufficient to defeat the City's motion for summary judgment. While the court has reviewed the two volumes of exhibits with a special eye toward fairness, it has undertaken to address in this Memorandum only those arguments of law and fact specifically raised in his brief. Plaintiff cannot avoid his responsibility to present rebuttal evidence in a form that can be reasonably discerned as a contention.

[*21]

III. Discussion

*A. Summary Judgment Legal Standard*

*Rule 56 of the Federal Rules of Civil Procedure* provides that a court should grant summary judgment "...if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To survive defendant's motion for summary judgment, a plaintiff must establish that there is a genuine issue of material fact by coming forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56 (e). Summary judgment should be directed "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 – 23 (1986).* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* [*22]

"On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* A court should give credence to the evidence favoring the non-movant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached." *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions and not those of a judge. *Id. at 150.*

*B. (Counts I) Title VII Race Discrimination 42 U.S.C. §§ 2000e-2(a)(1)-(2) n4 and (Count II) Retaliation Claim, 42 U.S.C. § 2000e-3 n5*

> n4 Title VII *42 U.S.C. §§ 2000e-2* reads in relevant part:
>
> (a) Employer practices:
>
> It shall be an unlawful employment practice for an employer–
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[*23]

> n5 *42 U.S.C. § 2000e-3* reads as follows:
>
> (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Plaintiff's claims for damages and reinstatement under Title VII turn on his termination action. This is not a case where plaintiff can contend that, but for an unfairly-created disciplinary record, he would not have been terminated. His [*24] termination was based on conduct unrelated to the prior disciplinary actions. He was terminated pursuant to a uniform policy whereby any officer for whom a probable cause arrest warrant issues is terminated automatically and reinstated only if a neutral arbitrator determines that there was no probable cause for the arrest warrant. Plaintiff was arrested pursuant to a warrant approved by the district attorney's office and issued by a bail commissioner. The district attorney's office and bail

Case 1:05-cv-00178-SLR    Document 51-6    Filed 04/10/2006    Page 8 of 14

Page 7
2002 U.S. Dist. LEXIS 10276, *24

commissioner are not arms of the police department and, in this case, each independently determined that there was probable cause to arrest plaintiff.

The City has articulated a legitimate, non-discriminatory reason for plaintiff's termination and he has not and cannot rebut the proffered reason. All of the evidence surrounding the purported burglary of his home, including his version, was placed in an affidavit prepared by investigating officers. Upon its independent review of that body of evidence, the district attorney's office determined that there was probable cause to apply for an arrest warrant. A bail commissioner agreed that the arrest warrant should issue. It issued and plaintiff was [*25] arrested. An arbitrator, chosen pursuant to the provisions of plaintiff's union's collective bargaining agreement, heard all of the evidence and concluded that there was probable cause to arrest plaintiff for staging a burglary and making false allegations that caused a citizen's improper arrest. As did the police department, the arbitrator determined that there was "just cause" for plaintiff's termination independent of his disciplinary record.

With respect to plaintiff's non-termination Title VII claims, the City also has articulated non-discriminatory reasons for each of its disciplinary actions against plaintiff. Those reasons are unrebutted here and cannot be rebutted otherwise. He had a PBI hearing on every disciplinary action. The PBI hearing boards made findings of fact and determined that he had violated either the police department's sick leave policy or the disciplinary code and specified which rule or regulation had been violated. Plaintiff has not disputed the findings of fact made by the PBI hearing boards or, for the most part, the underlying events that resulted in the disciplinary actions. It is undisputed that these rules and regulations applied to plaintiff, apply [*26] to all Philadelphia police officers and that the discipline meted out by the PBI hearing boards was in accordance with the Disciplinary Code.

*1. Termination Action*

*a. The Race Discrimination Claim*

Plaintiff alleges that he was subjected to race discrimination in violation of Title VII when the City terminated him. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J. at 27.) Absent direct evidence of race discrimination, to bring a race discrimination claim under Title VII, a plaintiff must establish a prima facie case of discrimination by producing evidence that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse job action; and (4) employees who are not members of the protected class were treated differently. *Townes v. City of Philadelphia, 2001 U.S. Dist. LEXIS 6056, No. CIV.A.00-138, 2001 WL 503400,* at *3 (E.D. Pa. May 11, 2001).

The burden then shifts to a defendant to offer a legitimate non-discriminatory reason for its personnel action. The defendant satisfies its burden of production if it introduces evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable [*27] employment decision. *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).*

If the defendant meets this burden, the burden of production shifts to the plaintiff, who, to defeat summary judgment, must show by a preponderance of the evidence that the employer's explanation is pretextual. *Id. at 763.* To meet this burden, the plaintiff must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant; or 2) allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment decision. *Id. at 764.* The non-moving party must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence" and infer that the employer did not act for the asserted non-discriminatory reasons. *Id. at 765.* If the plaintiff can successfully demonstrate pretext, he need not present affirmative evidence of discrimination beyond his prima facie showing if a rational [*28] fact finder could conclude from the evidence of pretext that the defendant's actions were discriminatory. *Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 283 (3d Cir. 2001)* (quoting *Reeves, 530 U.S. at 147).* n6

> n6 The court dispenses with discussion of whether plaintiff established a prima facie case of race discrimination because the briefing and oral argument focused upon the question whether plaintiff has submitted sufficient evidence that a rational fact finder could say the City's proffered reasons are pretextual.

As discussed, supra, the City has offered a legitimate non-discriminatory reason for plaintiff's termination. Plaintiff was arrested because investigating officers thought that there was probable cause to believe that he staged a burglary of his home and that he had caused a citizen to be falsely arrested for allegedly participating in the burglary. The belief that probable cause existed was based on corroborated findings at the scene, plaintiff's [*29] observed conduct and words at the scene, and his conduct surrounding the arrest of Mr. Tarrance.

As evidence that plaintiff was terminated based on the police department's uniform policy that any police offi-

Case 1:05-cv-00178-SLR   Document 51-6   Filed 04/10/2006   Page 9 of 14

Page 8
2002 U.S. Dist. LEXIS 10276, *29

cer who is arrested is automatically terminated, the City submitted an affidavit by the Deputy Commissioner for Internal Affairs who stated in relevant part: (1) it is the Philadelphia Police Department's policy to discharge police officers who are arrested for criminal acts; (2) even if a police officer is not convicted of the crime for which he has been arrested, it is the Police Department's policy not to reinstate such an officer; and (3) since 1996, at least 85 police officers have been discharged after being arrested in accordance with this policy. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. S., Norris Aff. at PP 4-6.) Plaintiff has not come forward with rebuttal evidence that any of these 85 officers was black.

Since plaintiff was terminated because he was arrested, his case turns upon whether he has presented sufficient evidence from which a fact finder could infer that there was an absence of probable cause to issue the arrest warrant and that racial animus [*30] or a retaliatory motive was the reason the warrant issued. Plaintiff does not dispute that the events discussed in the arrest warrant as the bases for probable cause occurred and he has presented no evidence that any similarly situated white officer was treated differently.

Asserting that his arrest was "malicious," n7 plaintiff states that the City found his gun two days before the IAD completed the final investigation of the burglary incident, omitted this information from the IAD's final report, and "withheld this information from Plaintiff and his attorneys before and during the arbitration." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 4.) Plaintiff also details "mistakes" in the procedure used to investigate the alleged burglary of his home. (Id. at 14-20.)

> n7 The court construes this argument as an attempt by plaintiff to show that his arrest was pretext for racial animus or a retaliatory motive.

Assuming for purposes of summary judgment that the City knew about the finding of his service [*31] weapon and did not mention its discovery to plaintiff or to the arbitrator, plaintiff has presented no evidence to support an inference that the subsequent possessor of his service revolver took the gun from his home during the alleged burglary, or that any failure of City personnel to connect the gun found to an ongoing arbitration proceeding and to disclose this information, was more than a mistake. See *Fuentes, 32 F.3d at 765* (finding that to discredit an employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken). That the gun was found in the possession of a person unknown to plaintiff is at least as consistent with plaintiff having lost or misplaced his service revolve at some prior time and place than the reported burglary as it is that the subsequent possessor of the gun stole the service revolver from his home by mysteriously gaining entry and then by throwing a brick from inside the house to escape. The gun was found months after the arrest warrant issued and plaintiff was arrested. The IAD investigation began two months after the arrest.

While plaintiff now suggests that a better police investigation [*32] might have provided more information which might have altered the decision of the district attorney's office and the bail commissioner, the best thing that can be said of that assertion is that this is a grand invitation to speculation and an ineffectual effort to try and ignore the fact that the ultimate decision-maker on the sufficiency of evidence for issuance of the arrest warrant, the bail commissioner, was not an employee or agent of the City or the City's police department.

### b. The Retaliation Claim

Plaintiff claims that his arrest and subsequent termination were acts of retaliation for his EEOC complaint and other internal complaints of discrimination. The City counters that there is no evidentiary causal link between plaintiff's termination and his complaints of discrimination. The evidence that plaintiff was terminated pursuant to a uniform police policy and procedure, discussed supra, is equally dispositive of plaintiff's claim of retaliation.

For plaintiff to establish a prima facie case of retaliation under Title VII, he must prove: (1) that he engaged in conduct protected by Title VII; (2) that his employer subsequent to this conduct took adverse employment [*33] action against him; and (3) that there was a causal connection between the protected activity and the discharge. *Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995)*. The court dispenses with a discussion of the first two prongs of the test, since the parties' briefs and argument at the hearing focused on whether plaintiff has presented sufficient evidence that there was a causal connection.

The City submits that the police detectives, who investigated the burglary and formed a belief that probable cause existed to apply for an arrest warrant, had no prior relationship with plaintiff and did not know about his complaints of employment discrimination. The charges against plaintiff were approved by the district attorney's office and an arrest warrant was issued by a bail commissioner, persons who had no knowledge of plaintiff's discrimination complaints. Plaintiff sought reinstatement through arbitration, but an impartial arbitrator rejected his grievance after conducting an extensive evidentiary hearing and finding "just cause" for plaintiff's arrest and termination by a clear and convincing evidence standard.

Plaintiff asserts that the police officers [*34] investi-

Case 1:05-cv-00178-SLR    Document 51-6    Filed 04/10/2006    Page 10 of 14

Page 9
2002 U.S. Dist. LEXIS 10276, *34

gating the alleged burglary of his home knew of his "job history which included the various complaints and EEO actions he filed against his supervisors." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 31.) However, the undisputed evidence is that the detectives and officers who investigated the alleged burglary of his home did not know that he had lodged discrimination complaints. n8 The burden is on plaintiff to produce evidence in some form that would cast doubt on the denials by the investigating officers. He has failed to do that.

> n8 Detective Gaul stated that he did not know plaintiff had pending a complaint against the Philadelphia Police Department for racial discrimination when he reached the conclusion that no burglary had occurred. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., Ex. 56, Gaul Dep. at 86.) Lieutenant Christy stated that he did not know that Mr. King had filed a complaint of race discrimination against the Philadelphia Police Department. (Id., Ex. 58, Christy Dep. at 37.) Officer Clyde Williams testified at his deposition that he had no information that Richard King had filed a race discrimination and retaliation lawsuit against the Philadelphia Police Department. (Id., Ex. 60 at 33.) Officer Cheryl Jackson stated in her deposition that she was informed that Richard King had filed race discrimination complaints against the police department, but she does not indicate whether she learned this information before or after her investigation of the alleged burglary. (Id., Ex. 61 at 26-27.)

[*35]

As support that there was a causal link between his discrimination complaint and arrest, plaintiff emphasizes that his disciplinary record was referenced in the affidavit for arrest. (Id., Ex. 6.) However, there is a distinct difference in meaning between one's disciplinary record and one's record of discrimination complaints. Moreover, plaintiff has submitted no expert testimony showing that examining the disciplinary record of a police officer under suspicion for making false reports is so unreasonable and farfetched under facts as presented here as to be pretextual. n9

> n9 The arbitrator's opinion noted that Ken Rocks, the Vice-President of the Fraternal Order of Police Lodge 5, stated that based upon investigation reports provided to the Union by the City in fifty prior cases involving off-duty conduct the City had never before inquired into an accused officer's personnel records as part of the investigation. Mr. Rocks asserted, but without evidence, that some higher authority must have authorized Detective Prendergast to access plaintiff's personnel file during the criminal investigation. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss., Ex. T, Arbitrator's Opinion at 9.) There is no evidence that any of the cases to which Mr. Rocks's referred involved police officers under suspicion for making a false report to the police department.

[*36]

Plaintiff emphasizes that Lieutenant Christy documented in his notes about the burglary that "Police Officer King has a very long history in his short five years on the job." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J. at 20.) At the hearing on the motion for summary judgment, plaintiff's counsel vigorously argued that this statement referred to plaintiff's history of making discrimination complaints. However, there is no support for this inference, given the rest of the Lieutenant's testimony contained in the deposition record. There, Lieutenant Christy stated that plaintiff's disciplinary record was relevant to him in assessing whether or not plaintiff, a police officer, might be of the character to falsify a report to law enforcement. n10 There is no expert opinion on plaintiff's side that an investigating police detective could not reasonably seek and consider such information in assessing whether a police officer had a motive to make a false statement to the police department. Plaintiff offered himself as an expert, but he is not trained as a police detective and is not accepted as an expert on proper police detective investigatory procedures.

> n10 Lieutenant Christy stated that in his mind there was a connection between Mr. King's disciplinary record and whether or not his house truly had been burglarized. He stated, "the connection is that in Mr. King's short tenure in the police department he obviously had a long track record of disciplinary problems and so obviously there's a trend here..." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J., Ex. 57 Christy Dep. at 71.)

[*37]

The additional assertions that plaintiff urges to try to establish a causal connection between his discrimination complaints and termination are similarly unsupported. Such assertions alone cannot defeat summary judgment. Plaintiff contends that during the interrogation of Mr. Tarrance, one of the detective told Mr. Tarrance that he was "going to see that Richard King rots in jail." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J., King Aff. P 12.) Even, if true, this is consistent with a police

officer's conclusion that Mr. Tarrance had been falsely accused by Mr. King and that Mr. King's conduct was deserving of punishment, and is not consistent with an inference that Mr. King was going to be falsely accused by the police.

### 2. Non-Termination Disciplinary Actions

#### a. The Race Discrimination Claim

The City argues that it had a legitimate non-discriminatory reason for each of plaintiff's non-termination disciplinary actions—the fifteen, thirty, and ten-day suspensions. It submitted Directive 66, the sick leave policy, and the Police Department Disciplinary Code, as evidence of the policies which all Philadelphia Police officers must obey. (Def.'s Mem. of Law in Supp. [*38] of Mot. for Summ J., Exs. E & F.) The City also submitted the notices for each of plaintiff's suspensions which detail the specific sections of the disciplinary code which the PBI hearing boards found plaintiff had violated to warrant the suspension. Plaintiff has produced no evidence to challenge (1) the findings of fact by the PBI hearing boards; (2) the conclusions that he violated the rules specified in the suspension notices; or (3) the conclusions that the discipline given was in accordance with the directives in the police manual governing such conduct. n11 Nor has he submitted evidence that any similarly situated officers, white or black, were not treated similarly.

> n11 Plaintiff now disputes the validity of some of the evidence submitted at the PBI hearings. He denies that he was sick or out of the office during all of the times that he was cited for absences or tardiness. Plaintiff contends that in the DPR Unit a supervisor would approve a day off but never place this information in the relevant book and then would classify plaintiff as AWOL without telling him. Plaintiff asserts that he could not check his status because the relevant lines would be whited out or a new book would be in place. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J., King Aff. P 23.) Plaintiff has not submitted any evidence to support these allegations and, apparently, made no such claims before the PBI boards.

[*39]

Contending that the disciplinary actions against him were race-based, plaintiff asserts that he was disciplined more severely than Captains Brady and DiLacqua, both white. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J. at 29.) Plaintiff has submitted newspaper accounts concerning the lack of discipline that these two Captains received when Captain Brady was involved in a drunk-driving accident and then-Lieutenant DiLacqua ordered the scene of the accident altered. (Id., Ex. 51.) Plaintiff also provided a newspaper article entitled, "Cops Recall Bias Abuses: Legislative Panel to Issue Report," about hearings being held for a potential report for Mayor Street about possible discriminatory practices in the police department. (Id., Ex. 52.) Neither the situation of the Captains, nor the conducting of hearings, is evidence that plaintiff faced disparate treatment based on race or that the City's reasons for its disciplinary actions are pretextual. Rather than showing that plaintiff was discriminated against, the articles support an inference that the course of action involving plaintiff was standard police procedure and the treatment of the Captains was against procedure and attributable [*40] to their high-ranking positions on the force and not their race. n12

> n12 To the extent that plaintiff attempts to argue that the failure to arrest Captain Brady and Lieutenant DiLacqua is evidence that he faced disparate treatment, the discipline that the superior officers received is inapposite to plaintiff's case. He has to compare himself to the other 85 officers who the City asserts were similarly situated to plaintiff and terminated subsequent to their arrest. He has submitted no evidence that he was treated differently from those 85 officers.

Plaintiff also offers the deposition of Clyde Williams as evidence that the City's reasons for its actions against him are pretextual. Officer Williams stated that, from attending Guardian Civic League Meetings, he had heard that African-American police officers are subjected to harsher disciplinary actions as compared with white officers in the Police Department and that this is consistent with his personal experience. (Id., Ex. 60 at 22-27.) He also testified that [*41] he believed that the Police Department is under some sort of consent decree with respect to how African-American police officers are being disciplined in the workplace. (Id. at 25.) The court finds that these allegations are no more than unsubstantiated rumor and speculation and do not cast doubt on the City's proffered reasons, supported by evidence, for its disciplinary actions against plaintiff.

#### b. The Retaliation Claim

Plaintiff asserts that members of the PBI hearing boards that recommended his suspensions "were aware of my complaints of race discrimination against the City." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J., King Aff. P 20-21.) Plaintiff has failed to present any direct or circumstantial evidence that his suspensions did not conform to police policy and procedure. n13 Nor has

he submitted an affidavit or information from any member of any of the PBI hearing boards or any other source that he or she knew of his discrimination complaints.

> n13 Plaintiff cites *Glass v. PECO*, 34 F.3d 188 (3d Cir. 1994) and *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996) for the proposition that evidence of discrimination against other members of plaintiff's protected class is admissible in plaintiff's case and that prior and subsequent discriminatory conduct by defendant is admissible to prove plaintiff's case. The third circuit has noted evidence of discrimination against other employees or of a hostile work environment is relevant to "whether one of the principal non-discriminatory reasons asserted by [an employer] for its actions was in fact a pretext for...discrimination." *Glass*, 34 F.3d at 194-95. At this stage in the proceedings, this court makes no finding as to the admissibility of any of the evidence that plaintiff proffers as proof of retaliatory discrimination. Rather, even considering all of this evidence as true, the court finds that plaintiff has not met his burden to cast doubt on the City's legitimate non-discriminatory reasons for adverse employment actions against plaintiff.

[*42]

### 3. Title VII Hostile Environment Claim

#### a. The Race Discrimination Claim

Plaintiff alleges that the Philadelphia Police Department violated Title VII by maintaining a "racially hostile" and "racially discriminatory" work environment. (Compl. P 31.) Plaintiff argues that he was subjected to a racially discriminatory work environment when Officer Woltemate referred to him as a racial epithet which was "thereafter condoned by the City." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J. at 27.)

In order to establish a claim under Title VII for hostile work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." *Aman*, 85 F.3d at 1081 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). Specifically, a plaintiff must show: (1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable [*43] person of the same race in that position; and (5) the existence of respondeat superior liability. Id.

Assuming for summary judgment purposes that plaintiff has met the first prong for a hostile environment claim, he has not set forth any evidence to meet the second prong. Plaintiff makes only one allegation of a discriminatory comment against him which the City immediately investigated. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J., King Aff. P 3.) Plaintiff's allegation of a single epithet and then vague allusions to a discriminatory work environment are not actionable under Title VII. Title VII is not violated by the "mere utterance of an ... epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the conditions of employment. *Abramson*, 260 F.3d at 280 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)).

#### b. The Retaliation Claim

Plaintiff contends that after he complained about the racial conduct of Corporal Woltemate he was subjected to adverse employment action including [*44] being (1) denied sick leave and vacation time while white officers who did not complain about racial slurs were granted this leave; (2) physically pushed by Corporal Woltemate; and (3) told by Corporal Woltemate that he was going to make sure that plaintiff's work record would not get him a promotion. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J., King Aff. P 5.) Plaintiff also contends that "on March 10, 1998, the Commissioner requested from the Sergeant of the Internal Affairs Department to re-word a job that I had completed, relative to a shooting [on March 3, 1996], in such a way that it would appear that I did not have probable cause for the shooting. As a result of the re-wording of the job, I was required to be re-interviewed for the shooting incident." (Id., Ex.4.) n14

> n14 Plaintiff has submitted no evidence to support an inference that the incident was re-examined because of plaintiff's EEOC complaint. In fact, the record evidence shows that the other police officer involved in the incident was re-interviewed on September 5, 1997, for clarification on the incident. (Id., Ex. 18 at 3.)

[*45]

The third circuit has found that retaliatory conduct, other than discharge or refusal to rehire, is proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives him or her of "employment opportunities," or "adversely affects his [or her] status as an employee...Not everything that makes an employee unhappy qualifies as retaliation." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d

Cir. 1997). The above allegations and plaintiff's claim that defendant more diligently imposed its rules and regulations against him in retaliation for plaintiff's discrimination complaints, (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ J. at 12), does not constitute adverse employment action for purposes of Title VII liability.

### B. The City is Not Liable Under 42 U.S.C. § 1983 (Counts III-IV)

Plaintiff alleges that the City is liable pursuant to *42 U.S.C. § 1983* for violations of his rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution. Defendant argues that plaintiff cannot satisfy the demanding requirements for § [*46] 1983 liability. The City is not liable through respondeat superior for the constitutional torts of its employees. Rather "municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Robinson, 120 F.3d at 1295* (quoting *Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)); Bd. of City Comm'rs of Bryan City v. Brown, 520 U.S. 397, 405, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997)*. In *Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990)*, the third circuit explained that a government policy or custom can be established in two ways: (1) a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict; or (2) a municipal custom that, although not authorized by law, is so permanent and well-settled as to virtually constitute law. *Id. at 1480*. Under either approach, the plaintiff has to establish that a policymaker is responsible [*47] either for the policy or, through acquiescence, for the custom. Also, the plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. *Oklahoma City v. Tuttle, 471 U.S. 808, 823, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)*. There is no support in the record that plaintiff's alleged deprivations of rights were the result of a policy, practice, or custom of the City of Philadelphia's Police Department.

Plaintiff alleges that his complaints of racially derogatory comments by Corporals Woltemate and Stewart were ignored by the City so "the hostility which he endured after these complaints were made was implicitly or expressly condoned by the City as a matter of practice, pattern, routine" and this disregard of his complaints represents "deliberate indifference to plaintiff's complaints of racist slurs." (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 8.) Plaintiff further offers the fact that he was disciplined more severely than Captains Brady and Dilacqua as evidence of a policy or practice of disciplining African-American officers more severely than white officers. (Id. at 29.) Plaintiff also relies on the [*48] deposition of Officer Clyde Williams as evidence that the City has a practice of discriminating against African-American officers.

An isolated incident or series of incidents will not suffice to establish a municipal custom that is sufficiently "permanent and well-settled" to virtually constitute law. *Robert S. v. City of Philadelphia, 2000 U.S. Dist. LEXIS 4020, No. CIV.A.97-6710, 2000 WL 341565, at *6 (E.D. Pa. March 30, 2000)* (three examples of violations are insufficient evidence that violating the policy, rather than the policy itself, is the true policy or practice). While plaintiff claims that the racially derogatory comments by Corporals Woltemate and Stewart were condoned, plaintiff only alleges one incident and the record evidence shows that the City launched an investigation into the incident immediately. As discussed supra, rather than showing a policy of discrimination, the Brady and Dilacqua incidents demonstrate that the disciplinary actions plaintiff faced were in accordance with police procedure and the treatment of the Captains was contrary to any policy, practice, or custom of the Philadelphia Police Department. Finally, the court finds that the hearsay testimony of Officer [*49] Williams falls far short of establishing a municipal policy, practice, or custom.

Plaintiff alleges that Lieutenant Ludd retaliated against him for filing a discrimination complaint, but this allegation was immediately investigated and found to be unsubstantiated. Plaintiff also alleges that the City retaliated against other City employees who complained of Title VII violations or filed complaints with the EEOC. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 2.) Plaintiff stated in his affidavit that the City has pursued practices of "harassing critics... within and without the Philadelphia Police Department who complain about violations of Federal law prohibiting racial harassment, racial discrimination or sexual harassment or sex discrimination within the Philadelphia Police Department." (Id., King Aff. P 16.) "The City has routinely failed to implement effective training, practices and procedures which would discourage and prevent racially motivated personnel practices and/or retaliatory conduct directed towards those employees who complain about violations of Federal laws..." (Id. P 17.) The City correctly notes that plaintiff's assertions, without more, do not constitute [*50] evidence sufficient to survive summary judgment. n15

> n15 Defendants argue that plaintiff filed his complaint on December 10, 1999 and can only recover for employment actions that accrued after December 10, 1997. Because the court finds that

there is no municipal liability, the court dispenses with an analysis of which disciplinary actions or incidents fall within the time frame for § 1983 liability.

IV. Conclusion

For the foregoing reasons, the City's Motion for Summary Judgment is granted. Judgment in entered in defendant's favor and all claims against defendant are dismissed with prejudice.

An appropriate order follows.

JUDGMENT ORDER

AND NOW, this 4th day of June 2002, upon consideration of Defendant's Motion for Summary Judgment, it is hereby ORDERED that the motion is GRANTED. JUDGMENT is ENTERED for the Defendant on all claims.

BY THE COURT:

JAMES T. GILES, C.J.