Case 1:05-cv-00178-SLR    Document 56-9    Filed 04/27/2006    Page 1 of 5

| Boyd | v. | Wilmington Police Department |
|---|---|---|
| Michael J. Szczerba | C.A. # 05-178 KAJ | January 23, 2006 |

Page 38

1  A. That's correct.
2  Q. Did you recommend her because she's white?
3  A. No, I did not.
4  Q. With regard to promotions within the band, are
5  all your promotions based on seniority within the
6  band?
7  A. No.
8  Q. Were you the first chief to officially add
9  seniority points to the promotional system in general?
10  A. That's correct.
11  Q. Have you ever made a decision based on an
12  individual's race or gender?
13  A. No.
14  Q. Going back to, I guess, it's Szczerba 1 --
15  A. This is Szczerba 1.
16  Q. Why did you promote Dennis O'Connor?
17  A. Dennis had supervisory qualities which were
18  noteworthy. First thing comes to mind is he has spent
19  some time in the development and bringing back of our
20  K9 unit which did not exist for quite some time. He
21  then assumed a role of an acting supervisor at the
22  rank of corporal and held that position for quite some
23  time. Not in particular for Dennis, but to have that
24  position elevated to a sergeant's position. I tried

Page 39

1  unsuccessfully a couple of times in the budget
2  process, but in essence he was holding a position that
3  would have supervisory responsibilities and someone
4  has to have supervisory qualities to lead in that
5  position.
6  Q. Why did you promote Joseph Sammons?
7  A. Joe has always shown great initiative,
8  dedicated officer. He's always been self-motivated to
9  proceed in his professional qualifications. He's a
10  fingerprint expert. A lack of any significant
11  disciplinary matters. He had been a leader within the
12  unit itself in the evidence detection unit. So he
13  showed leadership qualities without the formal title.
14  Q. And Liam Sullivan, why did you promote Liam
15  Sullivan?
16  A. Liam Sullivan, again, highly motivated, a good
17  investigator, recognized by his peers and supervisors
18  as a quality officer, has brought distinction and
19  honor to the Wilmington department being one of the
20  top 50 officers in the entire country. His -- I
21  guess, gone to the extreme limits of being
22  self-motivated and holding positions of -- that
23  really, not under close supervision, but working with
24  the FBI and the task force position, brought to

Page 40

1  justice numerous wanted felons while as part of the
2  unit, and continues to conduct himself in such a
3  manner.
4  Q. Now, you did explain why you selected Mike
5  Rodriguez. Let me ask you specifically. What is your
6  understanding of Sergeant Rodriguez's relationship
7  with outside agencies?
8  A. He also held a task force position, I believe,
9  with the Drug Enforcement Administration, good working
10  relationship with the Attorney General's office, the
11  City Solicitor's office, federal prosecutors.
12  Q. Would it be accurate to say that these
13  individuals stood out among the group?
14  A. Yes. Not collectively, but when it came time
15  for the selections, in comparison with the rest of the
16  band, there's has to be a breaking point somewhere,
17  and they are all highly qualified individuals and it
18  was a difficult or challenging decision to make.
19  Q. This is based on what you know and in your
20  opinion, correct?
21  A. That's correct. It's the authority and
22  responsibility that the chief of police for the City
23  of Wilmington has.
24  Q. And what race is Mike Rodriguez?

Page 41

1  A. Hispanic.
2  Q. This issue with you being the godfather of Mike
3  Rodriguez's son, I think you've already said that that
4  was not true, correct?
5  A. That's correct.
6  Q. Any idea where this could come from?
7     MR. MARTIN: Objection. But go ahead and
8  answer it.
9  A. Okay. The possibility may be where there's a
10  confusion, at one point with -- prior to Mike
11  Rodriguez's wedding, I was working with him. At the
12  time he came into a bind where -- I don't know what
13  the age of the child was, seven- or eight-year-old who
14  backed out from walking with the flower girl in his
15  wedding. It was several days before the wedding. I
16  offered the services of a friend of mine who had a son
17  the same age at that point and offered his services to
18  walk with this flower girl in a wedding. Mike took me
19  up on the offer, and I got him through the tuxedo at
20  the last minute and we had him in the wedding. And
21  that's maybe where the confusion lies as to whether I
22  was a godfather or not.
23  Q. With regard to disciplinary records, do you
24  review the disciplinary records of the individuals who

11 (Pages 38 to 41)

Case 1:05-cv-00178-SLR  Document 56-9  Filed 04/27/2006  Page 3 of 5

Case 1:05-cv-00178-SLR    Document 56-9    Filed 04/27/2006    Page 4 of 5

| Boyd | v. | Wilmington Police Department |
|---|---|---|
| Michael J. Szczerba | C.A. # 05-178 KAJ | January 23, 2006 |

Page 14

1  (Szczerba Deposition Exhibit 1 was marked
2  for identification.)
3  BY MR. MARTIN:
4  Q.  Chief, I'm giving to you what has been marked
5  Szczerba 1 for this deposition, the document from
6  Management Scientist, dated April 15, 2002, addressed
7  to you, showing bands for all sergeant candidates.
8  Does that look familiar to you?
9  A.  Yes.
10  Q.  Let me direct your attention to Bands I and II
11  on this particular sheet of paper.  And I will
12  indicate to you that the numbers written there next to
13  the some names and Bands I and II were written by Ken
14  Boyd, and those numbers represent promotion dates of
15  various candidates.  Now.  If we look at Band I, do
16  you have any reason not to believe that Wyatt was the
17  first promoted, followed by Jones, and then Donohue?
18  A.  No.
19  Q.  Do you have any reason to believe that Wyatt
20  was more senior than Jones who was more senior than
21  Donohue?
22  A.  Technically, yes.  Wyatt would -- now knowing
23  him in hindsight, Wyatt with more time than Jones.
24  However, with Donohue, if you're -- I see it noted in

Page 15

1  here in handwriting if you have the same list I do, it
2  has at that time she was not a cadet.  But which,
3  however she does have prior service under the police
4  department in a different capacity but not at a cadet.
5  Q.  She was actually a dispatcher, was she not?
6  A.  I believe she worked as a parking regulation
7  enforcement officer.  I believe she has some
8  experience as a supervisor in our support services
9  division, data entry, and that's all I'm aware of, but
10  she was not a cadet.
11  Q.  But that certainly would not count towards her
12  time and grade as a Wilmington police officer?
13  A.  Not as time and grade.  It would count for
14  vacation scheduling, and I guess towards retirement
15  because it would allow you to have a buy-in for the
16  add-on to your police time, military service, and
17  previous service with the city.  So in that essence,
18  yes, seniority does come into play there.
19  Q.  Let me go back.  A moment ago you denied that
20  you used the a seniority-based promotional system, is
21  that fair to say?
22  A.  That's correct.
23  Q.  And is it also your denial that you deny
24  telling other of your officers that you used seniority

Page 16

1  to promote within a band?
2  A.  That's correct.
3  Q.  Are you aware of any type of misunderstanding
4  as to why other officers have come in here and
5  testified about seniority and you say it was not
6  seniority?
7      MS. TASSONE:  Objection.  I don't what
8  other individual --
9      MR. MARTIN:  I'm trying to understand.  I
10  mean, it's either -- I won't use the analogy black and
11  white.  That's probably very inept, but I mean, it's
12  180 degrees, you know, where you have an officer, your
13  number 2 man, Inspector Howell, who said he's heard
14  you on at least three occasions say it was seniority.
15      MS. TASSONE:  I'll object.  It
16  mischaracterizes -- it's not his testimony.
17      MR. MARTIN:  Well, that's fine.  You may
18  answer, Chief.
19      MS. TASSONE:  Yes.
20      MR. MARTIN:  We are trying to understand
21  this.
22  A.  It may have come up in discussions with
23  officers when you go over -- you can see this list,
24  for example, how it's marked up and officers trying to

Page 17

1  gauge how picks are being made.  For example, it may
2  not also be spoken of as seniority.  They may try to
3  gauge, for example, myself -- oh, he served with him
4  and her in detectives and that's why they're picked,
5  or, look, these are all former A Platooners in the
6  patrol division.  So they try to -- I guess, in
7  discussions, try to fathom some type of system or how
8  the selections are being made.
9      It was brought to my attention one time of
10  a sergeant's candidate inquiring as to if this was
11  being done by seniority, who was subsequently
12  promoted.  But my response -- and I don't recall who
13  brought that to my attention -- my response was to
14  relay to that office it was not being done like that.
15  You have officers of varying service with the --
16  services with the department.
17      However, without having all of them from
18  the same class, you're going to -- same class I mean
19  same academy class -- you're going to have some
20  difference in their seniority with the police
21  department, some greatly and some just a matter of
22  years or matter of months.
23  BY MR. MARTIN:
24  Q.  As to Band I, though, do you dispute the

Case 1:05-cv-00178-SLR   Document 56-9   Filed 04/27/2006   Page 5 of 5

| Boyd | v. | Wilmington Police Department |
|---|---|---|
| Michael J. Szczerba | C.A. # 05-178 KAJ | January 23, 2006 |

Page 10

1  and should have been in quite another band?
2  A.  I have not had that experience.
3  Q.  Do you have any kind of recourse to adjust that
4  band when you find some type of error?
5  A.  If that was brought to the attention, there is
6  the availability of appeal.  For example, on the
7  written test, for -- appeal certain written questions
8  which were submitted in writing, and then they are
9  evaluated by the consultant, and the decision is made
10 then.
11 Q.  Okay.
12 A.  But as far as any appeal of one moving by way
13 of appeal where there was a mistake made in moving
14 from one band to another, I'm not aware of that.
15 Q.  Now, let's talk about how you select candidates
16 within each band.  As I understand your testimony,
17 once you're in the band, all those seniority points
18 and any other points go out the window.  All the
19 people are considered equal?
20 A.  Yes.
21 Q.  And then it's up to you as chief to make that
22 selection, correct?
23 A.  That is correct.
24 Q.  Before you make that selection from a band --

Page 11

1  and we are just talking generically here.  We'll talk
2  in a few minutes specifically about Officer Boyd.
3  What do you do to determine the most eligible
4  candidates within the band?
5  A.  I try to pick the person who I believe that the
6  men and women of the Wilmington Department of Police
7  would follow.  And I'll be repeating myself somewhat,
8  but taking into consideration the overall supervisory
9  capabilities, again, the ability to make decisions,
10 make independent decisions, communication skills,
11 their display of their initiative, self-initiation of
12 activity, the ability to go above and beyond.  Example
13 there would be participation in our crisis management
14 team, for example.  Again, respect by peers and
15 subordinates.  If there was something recently
16 happened disciplinary-wise, that would be taken into
17 consideration and, of course, their experience.
18      By experience, it's just not a matter of
19 the number of years you have at any particular job or
20 on the police department, it's what you have done with
21 what you have learned with that experience.
22 Q.  Now, how is it as chief you gather this
23 information?
24 A.  Through constant review of personnel on a daily

Page 12

1  basis, an hour-by-hour basis, actually get feedback
2  from supervisors.  All investigations come across my
3  desk.  There's a yearly performance evaluation
4  submitted by supervisors that are signed off by
5  myself.
6  Q.  As you're going to select from Band I, for
7  example, and let's say there are three candidates in
8  there, do you make it a point to talk to each of the
9  three candidates' supervisors?
10 A.  No.
11 Q.  You have access to their personnel files?
12 A.  Yes, I do.
13 Q.  You review those files?
14 A.  No.
15 Q.  You said that you do this hour by hour, meaning
16 that, at your desk, you see all kinds of complaints
17 and performance reviews, et cetera, that go through?
18 A.  That's correct.  Investigative reports,
19 supervisor evaluations, miscellaneous investigations,
20 reports, daily memorandums, the full gamut.  People
21 that are -- review of reports that are submitted by
22 our medical dispensary.
23 Q.  But as you prepare to select from a particular
24 band, you don't do anything specific with regard to

Page 13

1  the candidates in the band?
2  A.  No.
3  Q.  This is just something that you keep in your
4  head based upon what you've seen happening in the last
5  year or years?
6  A.  Yes.
7  Q.  Now, is it fair to say, Chief, that, at least
8  for the first few years of your administration, that
9  you used a seniority system within the band for a
10 means of selecting the candidates?
11 A.  No.
12 Q.  Did you at any point use a seniority system for
13 the selection of candidates within a band?
14 A.  No.
15 Q.  So if I were to represent to you that Inspector
16 Howell sat in that seat just an hour ago and said that
17 he heard you on two or three occasions say that you
18 were going to follow a seniority system, you will
19 disagree with that?
20 A.  That's correct.
21      MR. MARTIN:  Might as well have this one
22 marked as an exhibit because I haven't done that yet,
23 and I probably should.  Let's have this marked
24 Szczerba 1.

4 (Pages 10 to 13)