IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KENNETH A. BOYD, | : |
| | : |
| Plaintiff, | : |
| | : C.A. No. 05-178 (KAJ) |
| v. | : TRIAL BY JURY DEMANDED |
| | : |
| CITY OF WILMINGTON, | : |
| | : |
| Defendant. | : |

**MOTION FOR A NEW TRIAL**
**AND INCORPORATED MEMORANDUM OF SUPPORTING POINTS**

Plaintiff Boyd, through undersigned counsel, respectfully moves this Honorable Court for a new trial pursuant to Federal Rule of Civil Procedure 59 on the grounds of newly discovered evidence. Specifically, undersigned counsel has recently learned that the Court's procedure for selecting a sample jury pool does not comply with the provisions of the Jury Selection and Service Act of 1968, 28 U.S.C.S. § 1861, *et seq*. Further, Plaintiff Boyd warrants a new trial on the grounds that the Court erred in its instruction with respect to the impeachment of Lieutenant (hereinafter "Lt.") Mitch Rock in violation of Federal Rule of Evidence 611(b).

Pursuant to Federal Rule of Civil Procedure 59, a new trial may be granted to all or any parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. A hearing on this motion is respectfully requested. As grounds for this motion, Plaintiff Boyd relies upon the following points and authorities, any of which may appear in supplemental pleadings which he reserves the right to file, and at the requested hearing on this motion.

**PROCEDURAL BACKGROUND**

This action came before the Court for a jury trial beginning on October 2, 2006. The jury rendered its verdict on October 4, 2006, finding that Plaintiff Boyd had not proven that he was discriminated against because of his race. On October 12, 2006, based on the jury's verdict the Court ordered and adjudged that judgment should be entered in favor of the Defendant, City of Wilmington, and against Plaintiff Boyd on the claims in his Amended Complaint.

**ARGUMENT**

I.   **The Court's Procedure for Selecting a Sample Jury Pool Does Not Comply with the Provisions of the Jury Selection and Service Act of 1968, 28 U.S.C.S. § 1861, *et seq.***

The Jury Selection and Service Act of 1968 provides that it is the policy of the United States that all litigants in Federal courts entitled to a trial by jury shall have the right to grand and petit juries selected at random from a *fair cross section of the community* in the district or division wherein the court convenes. 28 U.S.C.S. § 1861. Under the Constitution, a jury of one's peers means a fair sampling of a cross section of the vicinage in which the case is to be tried. To satisfy this requirement, petit juries must be drawn from a source *fairly representative* of the community. Henry v. State Farm Ins. Co., 788 F. Supp. 241, 244 (E.D. Pa. 1992). The jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof. Taylor v. Louisiana, 419 U.S. 522, 538, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975).

The U.S. Supreme Court has held that in order to establish a violation of the fair-cross-section requirement of the Seventh Amendment, a plaintiff must show (1) that the group alleged

to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. Duren v. Missouri, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 99 S. Ct. 664 (1979).

Following the defense verdict entered in this matter and the apparent reluctance of Juror No. 5 to agree with this verdict, undersigned counsel had reason to question whether the jury venire was representative of the population of the State of Delaware. These observations led undersigned counsel to explore the Jury Plan for this District as well as to speak with Jury Administrator John Trickey on three occasions between October 13 and October 24. It was during the last conversation with Mr. Trickey that counsel learned that out of 10,000 juror qualification questionnaires, the Court receives between 1,000 and 1,200 qualified candidates. (See Martin Affidavit, attached as Exhibit 1). Thus, the yield of qualified jurors from the submission of the mailed juror qualification questionnaires is between 10% and 12%. Id. The Jury Plan calls for the prospective jurors who are subpoenaed to come from the "qualified jurors" who are among the 10% to 12% jurors who are deemed qualified after completing and returning the juror qualification questionnaire. (Id., See Jury Plan, attached as Exhibit 2).

According to Professor Thomas Ilvento, the Chair of the Department of Food & Resource Economics at the University of Delaware, when a response rate of 10% to 12% exists, as is apparent in this instance, the risk of obtaining a biased sample with fewer minorities in the sample jury poll greatly increases. (See Ilvento Affidavit, attached as Exhibit 3). As a consequence, the sample is not representative of the community. Id. In analyzing the variation in mail response rates, the nonresponse rates for minorities are substantially greater than the

3

nonresponse rates for White non-Hispanic. *Id.* According to the U.S. government study of nonresponse to a single mailing of the 1990 Census of Population, a survey that requires response under penalty of law, nonresponse rates to the mailed Census survey for blacks was 43.4%, which was nearly double the rate for White non-Hispanics (22%).[1] Therefore, this process of selecting jurors based solely upon whether the juror responds to the Jury Qualification Questionnaire form creates a biased sample with minorities, specifically African-Americans, being *significantly* underrepresented in the sample jury pool. (*See* Ilvento Affidavit, attached as Exhibit 3).

Under F.R.C.P. 59, a new trial may be granted on the basis of newly discovered evidence if (1) the facts discovered are such a nature that they would probably change the outcome; (2) the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence; and (3) the facts are not merely cumulative or impeaching. Farm Credit Bank v. Guidry, 110 F.3d 1147, 1154 (5th Cir. 1997). In the present case, undersigned counsel had no reason to question the jury selection process until Juror 5, the only African American juror, reluctantly answered "no" when asked by the Court whether the Plaintiff was discriminated against. It was not until on or about October 24, 2006, that Plaintiff's counsel learned that the Court receives only 10% to 12% responses to the Jury Qualification Questionnaire. This response rate is not identified on the Court's Revised Plan for the random selection of grand and petit jurors. Thus, undersigned counsel had no way of knowing that the response rate was so low until prompted to inquire based upon Juror No. 5's reluctant response. Immediately thereafter, undersigned counsel met with Thomas Ilvento, a University of Delaware Professor with extensive experience with self administered survey. Professor Ilvento stated that the response

---

[1] David L. Word, *U.S. Census Bureau Who Responds/Who Doesn't? Analyzing Variation in Mail Response Rates During the 1990 Census* (visited October 18, 2006) ‚http://www.census.gov/population/www/documentation/twps0019.html>.

rate for African-Americans is nearly double the rate for White Non-Hispanics. Therefore, in order to have a sample jury pool that is representative of a cross section of the community, the rate of return for the questionnaire form should be at a rate of 50% or greater to avoid the risk of obtaining a biased sample with fewer minorities. (Ilvento Affidavit, attached as Exhibit 3).

As a consequence of the disproportionate nature of the sample jury pool, the effect was that the lone African American juror was subjected to an increased risk of intimidation and coercion. During the course of jury deliberation there are numerous pressures which are brought to bear upon the jurors, particularly those who find themselves in a minority. However, the likelihood of intimidation and coercion increases as the size of the minority diminishes.

Plaintiff Boyd spoke with Juror No. 5, the only African-American juror, while in New Castle, Delaware. (See Boyd Affidavit, attached at Exhibit 4). According to Juror No. 5, as soon as they went to the deliberation room, one juror insisted that they take a vote without discussing the facts of the case. Id. A vote was taken immediately and although she was Juror No. 5, she was the last to vote. Juror No. 5 voted in favor of Plaintiff Boyd. Id. One of the male jurors was very mean and intimidating toward Juror No. 5. Id. He began an argument with her and belittled her in front of the other jurors. Id. Juror No. 5 felt threatened by his conduct and demeanor. Id. Juror No. 5 advised Plaintiff Boyd that she "held out" as long as she could with her vote for Plaintiff. Id. She felt very isolated and was uncomfortable when the other jurors were speaking about babysitting and traffic concerns. Id. Finally, after the continual intimidation and threatening behavior, Juror No. 5 voted in favor of Defendant in order to appease the eight other jurors. Id. Juror No. 5 advised Plaintiff that she made a mistake and did not agree with the verdict. Id. This is further impact into the deficiency of the Court's jury plan.

The evidence shows that the Court's jury selection process results in venires that are not representative of minorities, specifically African-Americans, in the sample jury pool. As a consequence, the sample pool from which juries are selected is not fair and reasonable in relation to the number of minorities, specifically African-Americans, in the community. Plaintiff Boyd has been denied the opportunity of having a petit jury selected at random from a fair cross section of the community in the district where this Court convenes. Therefore, Plaintiff requests a new trial so that he may exercise his right to have his case heard before a jury that is drawn from a source that is fairly representative of the community.

## II. The Lower Court's Exclusion Of Appellant's Impeachment Evidence Was An Abuse Of Discretion That Warrants Reversal.

A trial court's discretion is broad when determining "the admissibility of evidence and whether a new trial should be granted based on an erroneous evidentiary ruling." Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1370 (3d Cir. 1991). Before a court may grant a motion for a new trial it must find (1) "that an error was made in the course of [the] trial"; and (2) that the error "was so prejudicial that refusal to a grant a new trial would be inconsistent with substantial justice." Farra v. Stanley-Bostitch Inc., 838 F.Supp 1021, 1026 (E.D. Pa. 1993). Such errors are those errors which "affect the substantial rights of the parties." Harkins v. Ford Motor Co., 437 F.2d 276, 278 (3d Cir. 1970).

This Court committed such an error when it confined the cross examination of Lt. Mitch Rock to the scope of his testimony given under direct. The impeachment evidence undersigned counsel attempted to elicit from Lt. Rock would have been highly probative toward demonstrating the racial bias of the witness; therefore admission of this evidence would not have

been a violation of either Fed. R. Evid. 611, or 403.  Thus, this evidence should not have been excluded.  As a result of the Court's ruling, the Plaintiff's substantial right to "effective cross examination" was irreparably harmed.  Douglas v. Owens, 50 F.3d 1226, 1230 (3d Cir. 1995).

At trial the parties may conduct cross examination of a witness, "limited to the subject matter of the "direct" or "matters affecting the credibility of the witness."  Fed. R. Evid. 611. Impeachment of the witness's bias or motives should not be excluded because it exceeds the scope of the direct examination.  33A Fed. Proc. § 80:133 (attached as Exhibit 5).  It is well established that a trial court may allow cross examination which exceeds the scope of direct examination where "matters affecting credibility are concerned."  Ellis v. Carter, 156 F.3d 493 (3d Cir. 1998).  This Court erred by limiting undersigned counsel's cross-examination to the scope of the witness' direct examination testimony.  During a side bar conference, undersigned counsel proffered to the Court that the testimony which he wished to elicit from Lt. Rock was for the sole purpose of impeachment by showing Lt. Rock's racial bias and motives.  (Trans. at 5, attached as Exhibit 6).  Ellis, *supra*.  Lt. Rock's credibility was at issue because he offered testimony on matters which were in dispute and his testimony was contrary to other witnesses who testified at trial.

To determine if evidence is unduly prejudicial a court must balance the probative value of the evidence against its prejudicial value, that which may lead a jury to rule based on emotion evoked by the evidence.  Fed. R. Evid. 403.  Any prejudice that would have accrued to the defendant by the introduction of Lt. Rock's use of racial epithets was "not enough to substantially outweigh its probative value."  White v. Honeywell, 141 F.3d 1270, 1283 (8th Cir. 1998).

The ultimate issue at trial was whether the City of Wilmington discriminated against Detective Boyd due to his race. Lt. Rock offered testimony on this ultimate issue and testified regarding the criteria Chief Szczerba uses to make promotion decisions. Undersigned counsel desired to demonstrate that Lt. Rock had used racial epithets in the past and offered contradictory testimony about his use of those words. (Turner v. City of Wilmington Answer to Motion for Summary Judgment, attached as Exhibit 7). This testimony would have been highly probative in allowing the jury to assess Lt. Rock's credibility and any biases or motives he may have. Evidence of a supervisor's previous use of racial epithets, even if the incidents were not extensive, is considered "highly potent evidence of attitude and environment," and is highly probative in a Title VII case. White, 141 F.3d at 1283. The Plaintiff's ability to demonstrate the "biases and motives" of Lt. Rock was central to a fair cross-examination. Douglas, 50 F.3d at 1234.

As a general rule, all evidence must be relevant to be admissible. Fed. R. Evid. 401. Evidence that has a tendency, no matter how slight, to disprove or prove a fact at issue is relevant. Id. Each specific piece of impeachment evidence should be logically relevant to the question of bias. Garden v. Wilmington Police, 683 A.2d 1041 (Del. 1996). The attribution of racial epithets to Lt. Rock is logically relevant to demonstrating his race-based biases and motives. As discussed, use of racial epithets by a supervisor is "highly potent evidence of attitude and environment." White, 141 F.3d at 1283. Whether or not a witness who is also a high ranking officer in the department uses racial epithets is relevant not only to the ultimate issue in the case, but also to his own motives or biases. It is logical and not unduly prejudicial for a juror to find that a person who has used racial epithets in the past, and subsequently made

contradictory statements about these incidents, may have racist tendencies and difficulty telling the truth.

The impeachment testimony which undersigned counsel sought to elicit from Lt. Rock would not have been cumulative. At trial, no witnesses were called to impeach the character of Lt. Rock, nor was any extrinsic evidence admitted regarding the credibility of Lt. Rock. Therefore, the trial court could not have been concerned that allowing undersigned counsel's line of questions would have been repetitive.

When a court's error affects a "substantial right" of a party, the case may be reversed and remanded for a new trial. Douglas, 50 F.3d at 1243. The lower Court's exclusion of impeachment evidence regarding Lt. Rock's use of racial epithets affected a substantial right of the Plaintiff, his right to "effective cross examination." Douglas, 50 F.3d at 1234. The court in Douglas recognized that "to properly evaluate a witness, a jury must have sufficient information to make a discriminating appraisal of a witness's motives and bias. *Id*. Due to the trial court's ruling, the jury never got an opportunity to make a "proper evaluation" of the witness. *Id*. To determine if the exclusion of impeachment evidence constituted a substantial error "a court must ask whether, if the excluded testimony had been allowed, the jury would have received a significantly different impression of the witness's credibility." U.S. v. Faison, 2006 WL 247360 (E.D. Pa.). The Plaintiff contends that had the jury heard evidence of Lt. Rock's use of the word "blank" as a substitute for the "n" word, they would have given his testimony less weight, if any, at all. Additionally, this evidence may have had a significant impact in the jury's overall assessment of the Defendant's witnesses and evidence. Armed with such information, a more discriminating jury would have likely found for the Plaintiff. Therefore, undersigned counsel

respectfully requests that this Court grant Plaintiff's motion for a new trial on the grounds that Plaintiff was denied his right to fairly cross-examine Lt. Mitch Rock.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that this Court grant his Motion for a New Trial.

**MARGOLIS EDELSTEIN**

/s/ Lori A Brewington
Jeffrey K. Martin (Del. Bar No. 2407)
Lori A. Brewington (Del. Bar No. 4522)
1509 Gilpin Avenue
Wilmington, DE 19806
(302)-777-4680
*Attorneys for Plaintiff*
*Kenneth A. Boyd*