Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EVERETT D. TURNER,                    :
                                      :
        Plaintiff,                    :
                                      :      C.A. NO. 05-716 (GMS)
        v.                            :
                                      :
CITY OF WILMINGTON,                   :      JURY TRIAL DEMANDED
                                      :
        Defendant.                    :
                                      :

## PLAINTIFF'S ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

> Jeffrey K. Martin, Esquire (DE-2407)
> MARGOLIS EDELSTEIN
> 1509 Gilpin Avenue
> Wilmington, DE 19806
> (302) 777-4680
> Attorneys for Plaintiff

Dated: September 18, 2006

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................ ii

NATURE AND STAGE OF PROCEEDINGS ........................................................... 1

STATEMENT OF FACTS .................................................................................. 3

ARGUMENT ................................................................................................ 15

I.     THE EXISTENCE OF GENERAL ISSUES OF MATERIAL FACT
       MUST PRECLUDE SUMMARY JUDGMENT............................................ 15

II.    PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CLAIM OF
       RACIAL DISCRIMINATION BY WAY OF HOSTILE WORK
       ENVIRONMENT. ........................................................................... 21

III.   PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CASE FOR
       RETALIATION.............................................................................. 25

CONCLUSION............................................................................................... 28

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 255 (1986) ................................................................................ 20

*Hampton v. Bureau of Tinton Falls Police Department,*
98 F.3d 107, 115-116 (3d Cir. 1996). ............................................................ 26

*Horowitz v. Fed. Kemper Life Assurance Co.,*
57 F.3d 300, 302 n.1 (3d Cir. 1995). ............................................................ 20

*Kachmar v. SunGard Data Systems, Inc.,*
109 F.3d 173 (3d Cir. 1999) .......................................................................... 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) ............... 20-21

*McDonnell-Douglas v. Green,*
411 U.S. 792 (1973) ...................................................................................... 24

*Pa. Coal Ass'n v. Babbitt,*
63 F.3d 231, 236 (3d Cir. 1995) .................................................................... 21

*Pennsylvania State Police v. Suders,*
542 U.S. 129, 134 (2004) .............................................................................. 20

### Unreported Decisions

*Seldomridge v. Uni-Marts, Inc.,*
2001 U.S. Dist. LEXIS 9491 (D. Del. 2001) .................................................. 21

*Zelinski v. Pennsylvania State Police*
2004 U.S. App. LEXIS 21235 (3d Cir. 2004) ................................................ 23

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff concurs with Defendant's Statement of the Nature and Stage of the Proceedings with the following exceptions. Plaintiff agrees to voluntarily dismiss the age discrimination claim and, in turn, focus on the racial discrimination and retaliation claims.

Plaintiff was unable to take any deposition discovery because Plaintiff was out of state on the west coast accompanying his wife on a business trip which began in June and ended in August. Plaintiff is not claiming any prejudice in being unable to complete any depositions. On the contrary, Plaintiff believes that the factual record is fully developed to the extent that Defendant produced all of the written documentation that was responsive to the Rule 26 Initial Disclosures. As will be developed in the Argument, *infra*, Plaintiff believes that Defendant did not produce all documents required to be disclosed under Rule 26.

Indeed, pages A-154 to A-157 (Inspector Wright's report of the Internal Investigation and the Memorandum from Captain Dietz to Inspector Wright regarding summary punishment of Lt. Rock) were produced in Defendant's Appendix but were never produced by way of Defendant's document production pursuant to Defendant's Initial Disclosures. In addition, it appears that Defendant did not produce the Internal Investigation Questionnaires from Officers Lynch, Curry, Crawford and Rentz, all of whom had direct knowledge of the matters being inquired into by way of the questionnaires.

Plaintiff objects to the use of Defendant's unverified statements to form a defense to Plaintiff's allegations. Specifically, Defendant produced Internal Investigation

Questionnaires from Officers Boardley, Connor and Harvey (A-96 through A-105), and the transcript of Mitchell Rock's interview. (A-107 through A-116). These items have not been verified but were cited in various forms in Defendant's Opening Brief.

This is Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

Plaintiff Everett Turner ("Plaintiff" or "Turner") served as a City of Wilmington Police Officer from November 13, 1989 through his medical discharge in July 2005. His rank at the time of his separation from the Wilmington Police Department ("WPD") was corporal. (A-1 through A-13).

In the mid-part of 2001, Plaintiff was reassigned to F Platoon. (A-118). In this capacity, he served as a community police officer primarily in an area of west Wilmington that was known by the federal agents as the "Weed and Seed" area because of extensive drug problems. (A-2). Turner found his niche in community policing and the community that he served appreciated his efforts. (A-29). F Platoon was the only platoon in WPD that provided community policing. (A-234). During his work in west center city with F Platoon, he received numerous awards and resolutions regarding his efforts in the community. (A-29).

Turner continued work in F Platoon until the time he was last on active duty, January 26, 2004.[1] (Tab L). Although Turner never returned to active duty, he was alerted that WPD management had agreed in early February 2004 to transfer him out of F Platoon. (Tab J).

Throughout Plaintiff's work in F Platoon from mid-2001 through January 2004, a period of approximately 2 1/2 years, Lt. Mitchell Rock (hereinafter "Lt. Rock" or "Rock") served as the Operations Supervisor for F Platoon. (Tab A). Plaintiff had frequent meetings with Lt. Rock approximately eight to ten times per week over this time period. (Tab A). Except for a short period of time when Turner initially worked under

---

[1] (Tab __) refers to Plaintiff's Appendix to this Answering Brief in Opposition to Summary Judgment which has been filed contemporaneously with the Brief but is separately bound.

Rock, Rock did not refer to Turner by his given name; rather, Turner was continually referred to by Rock as "motherfucker", "motherfucking 'blank'" or "dumbass". (Tabs A, C).

Plaintiff was very insulted by Rock's words of greeting and frequently advised Rock that this bothered him and asked if he could please refrain from using such words. (Tab A; A-125). During the last three months of Turner's active duty, there were three occasions that Turner asked him to desist (two in November and one in December). (Tab A). Rock's response to Plaintiff's request was "yeah, motherfucker, right" and he walked away. (Tab A).

The term "blank" was introduced to the WPD by Corporal Eric Green some time in the late 90's. (Tab B). The term was to substitute for the "n" word such that a black officer could use that with regard to another black officer without using the "n" word. (Tabs A, B, C, D and E). The word "blank" is currently used frequently in the WPD and its origin and meaning as a substitute for the "n" word are well known to the officers of the WPD.[2] (Tabs B, C, D, and E).

Rock's continual use of the words "motherfucker" and "blank" or used in combination occurred numerous times during this 2 ½ year interval. (Tab A). Plaintiff made at least six attempts during this time to request that he cease and desist the use of these words. (Tab A). Plaintiff did not go beyond Lt. Rock because he believed that it would not be effective. (A-126). Plaintiff was very distressed as a result of this continual

---

[2] Defendant does not agree with the meaning of this word and submitted various affidavits wherein the word "blank" was deemed "race neutral" and meant something different to each affiant: to Officer Alequine it is a negative to be filled in by the receiver (A-59); Officer John Burns: "loser" (A-69); Officer Michael Gifford: "nothing", "zero" (A-80); Officer Alfred Izquierdo: "Defendant" (A-85); and per Defendant's Answer to Complaint, paragraph 8, "knucklehead". (A-15).

hostile conduct toward him by his supervisor. The continual use of the word "blank" led Plaintiff to believe that it was racially motivated. (Tab A).

In addition to insults from Lt. Rock to Plaintiff, Plaintiff experienced other adverse conduct from him. (Tabs A, I). On one occasion, during roll call where all members of F Platoon were present, Lt. Rock used the "n" word in quotes when referencing an African-American prisoner. *Id.* As he said the "n" word, he looked directly at Turner. *Id.*

On another occasion, during a roll call, Plaintiff greeted Lt. Rock by saying "How are you today, Lt. Rock?" Rock's response was: "Everett, shut the fuck up and sit the fuck down." *Id.*

During another roll call, Lt. Rock observed that Plaintiff had a clipboard with various papers clipped to it. Plaintiff was in the process of doing paperwork. Rock then asked Plaintiff, "Is that my fucking clipboard, you fucking stole my clipboard! Give me my fucking clipboard." While Plaintiff was attempting to hand the clipboard to Rock, Rock snatched the clipboard from Turner's hands, throwing the papers onto the floor in front of everyone. At that point, Rock told Turner in front of the assembled members of F Platoon, "How do you like that motherfucker, fucking thief." *Id.*

At another roll call in December 2003, Rock inquired as to whom from the Platoon would be attending the Platoon holiday party that was being held at Harry's Savoy Grill. Plaintiff and Officer Curry advised Rock that they were not going to attend the party. Both officers were concerned about exposing their wives to Lt. Rock and his conduct. Although neither officer advised Lt. Rock of his reasons for not attending, Rock

proceeded to single out Officers Curry and Turner, stating, "You two, Curry and Turner, are fucking up, on and off duty." *Id.* (A-78).

Plaintiff prepared a four-page complaint dated January 26, 2004 to be given to Chief Szczerba. (Tab I). The complaint expressed his "total disgust of past and present events that have taken place on F Platoon that have taken place operating under the supervision of Lt. Mitch Rock of the City of Wilmington Police Department." In this complaint, Turner detailed much of the conduct of Rock toward him during those 2 ½ years but with an emphasis on the last few months. In the complaint, he said that he advised Chief Szczerba that he had never "experienced blatant, degrading disrespect and humility in any other jobs with the WPD." He closed by stating that he did not "expect to have to experience this horrific prejudice and unprofessional treatment within the Wilmington Police Department by Lt. Mitch Rock." *Id.* This complaint was hand-delivered by Turner's wife on January 27 to the City Personnel Office and to Samuel Pratcher, the City Personnel Officer and formerly Wilmington Police Chief. (A-249 through A-252).

As a result of Plaintiff's complaint, an investigation immediately began under the auspices of the Office for Professional Standards. (Tab O). The investigation was conducted by Inspector James Wright (the number two man in WPD) and Sergeant Steven Barnes. *Id.* According to Inspector Wright, his June 29, 2004 Departmental Information as a result of the Internal Investigation/Everett Turner (A-154), "all subordinate officers on F Squad were requested to submit a Departmental Information report and all complied." *Id.* This June 29 document was not supplied by WPD as a result of their Initial Disclosures. (Tab G). Further, it appears that at least four

6

questionnaires from officers working on F Platoon were not provided by way of Defendant's production or in the Appendix supporting their Opening Brief. (Tab O).

Sgt. Barnes, by way of a memo dated June 24, 2004, confirmed that Corporals Lynch and Curry corroborated Officer Turner's statement that Rock had told Turner to "shut the fuck up and sit down." (Tab M). Although Corporals Lynch and Curry were active members of F Platoon and where Curry was Turner's partner, there are no completed questionnaires from either officer.

Additionally, that same memo from Sgt. Barnes acknowledges that Officers Rentz and Crawford attended the 2003 Christmas party. (Tab M). Plaintiff alleged that there was a verbal altercation between Lt. Rock and Officers Crawford and Rentz. (Tab I). The record does not reflect any completed questionnaires from either Rentz or Crawford.

While Defendant stated in its Opening Brief that there was no evidence of an altercation between Lt. Rock and either Rentz or Crawford, the affidavit of former officer Reginald Harvey states that Officer Rentz, while at the Christmas party at Harry's Savoy Grill, had to come between Lt Rock and Officer Crawford to end a verbal altercation between the two at the restaurant. (Tab E).

The investigation completed by Inspector Wright confirmed that Lt. Rock, during a roll call in front of Plaintiff did tell Plaintiff to "shut the fuck up and sit the fuck down." (Tab O).

As to the use of the "n" word at roll call, while Inspector Wright confirmed that it was used by Lt. Rock, he found no transgression. (Tab O). Wright found that Rock was "merely quoting the Defendant." *Id.* He also determined that no other minority officer present was offended. *Id.* Wright did not acknowledge that Officer Alequine by his

7

affidavit said specifically that, "Several officers in the Platoon felt that the remark was communicated in an inappropriate forum." (A-59).

Wright and Barnes investigated Plaintiff's allegation that Rock berated Plaintiff and his partner, Curry, by stating "you guys are fucking up, on and off duty." (Tab O). They found that Lt. Rock did not recall this incident and, further, that they could not corroborate this through any of the other reports. (Tab O). However, the affidavit of Robert Curry found at A-78 refers specifically to this allegation which is found in paragraph 13 of Plaintiff's Complaint (the lawsuit). Curry's response was that "I remember the above-described comment made by Lt. Rock." (A-78). Curry went on to say that he felt that it was said in a jovial manner and that he was not offended by this comment. (A-78).

While the investigation did confirm the "clipboard incident" wherein Rock grabbed the clipboard from Turner and threw the papers on the floor, this was found not to be actionable because it was considered a joke. (Tab O). Lt. Rock was found to have "busted" on Turner. *Id.*

As a result of the investigation by Wright and Barnes, they could substantiate only one of Plaintiff's allegations and as a result, Lt. Rock received a written reprimand. (Tab O). A copy of the Summary Punishment Offer regarding Lt. Rock dated July 8, 2004 was not produced with Defendant's discovery but was produced as part of the Appendix. (Tab P).

Sometime in the month of February, Officer Reginald Harvey had an opportunity to look at his personnel file and found a memorandum from Lt. Rock to Chief Szczerba bearing a date of January 22, 2004 and captioned "Personnel Transfers". (A-233).

8

Harvey relayed what he had seen to Turner wherein he and Turner were to be transferred from F Platoon to one of the five patrol platoons. *Id.* This proposed transfer was signed off by Captain Marlyn Dietz, Supervisor of Lt. Rock on February 6, 2004 and was signed off by Inspector James Wright on February 13, 2004. (Tab J). This prospective transfer was later confirmed by Captain Maggitti of Human Resources Division, WPD, who advised that upon Turner's return to active duty, he would work under Lt. Battaglia in a patrol platoon. (A-287). Turner never received medical clearance to return to active duty and was subsequently "pensioned off" in July 2005. (Tab T).

In response to Plaintiff's complaint that was filed with the WPD on January 27, 2004, the Department immediately initiated an investigation. (Tab O). The investigation included a submission of a "Departmental Information Report" from all of the subordinate officers in F Platoon as well Sgts. Ciotti, Jones and Staats. This information appeared from the record to have been submitted to Inspector Wright during the first week of February, 2004. *Id.*

The subordinate officers were requested to answer seven specific questions having to do with Turner's allegations. (A-100). Inspector Wright reported that all of the subordinate officers in F Platoon as well as Sgts. Ciotti, Jones and Staats, submitted these reports. (Tab O). Defendant, as part of the document production pursuant to the Initial Disclosures and the documents contained in their Appendix supporting their Opening Brief, failed to submit six of the "Departmental Information Reports" that Inspector Wright stated had been received. They are from Sgts. Jones and Staats, and subordinate officers, Lynch, Curry, Crawford and Rentz.

This investigation was completed and reported by Inspector Wright in a Departmental Information to Chief Szczerba dated June 29, 2004. The investigation reached the following conclusions pertinent to Plaintiff's claim of discrimination:

1.   The investigation verified that Lt. Rock used the word "motherfucker" and "blank" while addressing officers.

2.   Plaintiff's complaint of the loose use of the "n" word by Lt. Rock was deemed unfounded. Inspector Wright found that this was a past incident and that Rock was merely "quoting the Defendant." In addition, they found that there were no other minority officers present who were offended.

3.   The investigation substantiated the claim that Lt. Rock told Plaintiff to "shut the fuck up and sit the fuck down." This was verified by Officers Lynch and Curry (whose Departmental Information Reports were not produced by Defendant).

4.   The "clipboard incident" was verified but was determined to be an instance where Lt. Rock "busted" on Turner.

5.   The investigation could not substantiate Turner's allegation that Lt. Rock told him and Curry "you guys are fucking up on and off duty."

6.   The investigation could not substantiate the alleged altercation at the Christmas party following Inspector Wright's interview of Officers Rentz and Crawford. There are no notes from any interview with Rentz or Crawford nor are there Departmental Information Reports from either Officer Rentz or Officer Crawford.

7.  The alleged remark made by Sgt. Jones wherein he told Turner that he was seeking "younger, more aggressive officers" was not substantiated because Sgt. Jones said he never told Officer Turner this.

8.  Inspector Wright could not verify that Officer Turner told Lt. Rock that Rock's comments were not welcome and to stop addressing Turner in this manner and, as a result of the entire investigation, Inspector Wright could find "no evidence of discrimination." (Tab O).

On April 12, 2004, Plaintiff filed a Charge of Discrimination jointly with the Delaware Department of Labor and the Equal Employment Opportunity Commission. (A-32). In that Charge of Discrimination, Plaintiff charged Defendant with racial discrimination, age discrimination[3] and retaliation. *Id.*

WPD, through its counsel and the Office of the Wilmington City Solicitor, responded to Turner's Charge of Discrimination by letter dated August 19, 2004. (A-37 through A-42). In their letter, the City categorically denied that it had discriminated against Cpl. Turner in any fashion and that it had not retaliated against Turner for filing an internal complaint against Rock. The City's letter addressed to the Delaware Department of Labor relied upon three affidavits that were attached to the August 19, 2004 letter, *id.*, the affidavits were written by Lt. Rock, Master Sgt. Staats, and Inspector Wright.

In his affidavit, Lt. Rock stated the following which are pertinent to Plaintiff's Charge of Discrimination:

---

[3] As noted in the The Nature and Stage of the Proceedings, Plaintiff will not further pursue a claim of age discrimination in this litigation. A-32. Plaintiff is not conceding that no age discrimination occurred but rather wishes to voluntarily withdraw and dismiss this claim.

(1)    He stated that he received notice from his superiors that Cpl. Turner had lodged a written complaint against him on or about February 17, 2004. ¶ 5.

(2)    Rock testified that he was "shocked" to receive Turner's complaint having believed that he had a "very good working relationship" with Turner. ¶ 6.

(3)    Rock acknowledged that he used "curse words and the term 'blank'" but it was "never directed specifically at Cpl. Turner or any other officer."

(4)    Lt. Rock swore that "Cpl. Turner has never expressed to me that he found the cursing or the use of "blank" to be offensive, humiliating or disrespectful at any time. ¶ 8.

(5)    Lt. Rock testified that "when an officer, including Cpl. Turner, greets me with 'Good morning' or 'How are you today', I have never responded by cursing them or by telling them to 'shut the f--- up'. ¶ 12.  (Tab R).

In April 2004, Plaintiff contacted Captain Maggitti, Human Resources Director at WPD, requesting the opportunity to come back to work. (A-1 through A-13). Maggitti's response was that Plaintiff would need to have a "fitness for duty evaluation by psychiatrist David Raskin" before reporting back to work. *Id.* Captain Maggitti also informed Plaintiff that upon his return to work, he would be assigned to the patrol division under Lt. Battaglia.

After being evaluated by Dr. Raskin, Plaintiff was found to be unfit for duty. (Tab K).  Raskin found, in particular, that Plaintiff is a "very angry man who is very resentful about what he considers to be humiliating and degrading treatment by the police." Dr. Raskin found that "[Turner] was potentially threatening in his speech to me about situations in which he would be spoken to inappropriately and his sense that he might respond in an aggressive manner to such a situation." *Id.*

On May 14, 2004, Plaintiff depleted his sick, vacation and comp time. On May 15, 2004 Plaintiff went on half-pay status through May 28, 2004. From May 29, 2004 to July 9, 2004 Plaintiff was on a no-pay status. (A-8).

On May 27, 2004, Plaintiff spoke with Gary Hutt, Director of Risk Management and Employee Benefits with the Wilmington Personnel and Benefits Department. Hutt stated that he was unaware of Plaintiff's situation but gave Plaintiff some advice and told him that he would look into the matter and return his call. Mr. Hutt never followed up with Plaintiff. (A-8).

Also on May 27, 2004, Plaintiff filed a petition for worker's compensation benefits. (Tab L). In the petition, which is found in Plaintiff's Appendix, Plaintiff described the incident as "work related stress inflicted by my superior officer." Plaintiff went on to state that "[d]ue to the continuous derogatory treatment and name calling and comments, it was necessary for me to be treated for stress, depression and high blood pressure." *Id.*

Defendant did not oppose Plaintiff's worker's compensation petition. As such, Plaintiff and the City entered into an "Agreement as to Compensation" dated June 28, 2004. Plaintiff continues to this day to receive total disability benefits under the City of Wilmington worker's compensation program. (Tab V).

Plaintiff was informed by Inspector Wright that Lt. Rock was charged with rude and insulting language. (Tab O). In a letter issued by Captain Nancy Dietz to Plaintiff on July 16, 2004, Captain Dietz from the WPD Office of Professional Standards advised Plaintiff that their investigation had not discovered any violations of equal opportunity or discrimination laws. (Tab Q). Plaintiff was advised, however, that Lt. Rock's conduct

13

was not within the "high standards of performance", and the Office substantiated a violation as a result of Turner's allegation and "the officer [Lt. Rock] will be disciplined appropriately." *Id.*

On June 6, 2005, Chief Szczerba wrote a letter to Cpl. Turner advising Turner that he was being placed on the Wilmington Department of Police Retirement List effective July 1, 2005. (Tab T).

## ARGUMENT

### I.    THE EXISTENCE OF GENERAL ISSUES OF MATERIAL FACT MUST PRECLUDE SUMMARY JUDGMENT.

It is apparent from the Statement of Facts that Defendant has produced more facts in dispute than it has provided corroboration for other less significant facts. WPD's Internal Investigation citing only certain statements from officers that were produced as well as citing statements that were not produced by Defendant in this litigation makes it clear that there is a great deal of controversy about the facts that laid the basis of Plaintiff's claim.

Plaintiff's racial discrimination claim arises from the following allegations:

1.    Lt. Rock's continual use of derogatory names toward Turner in both private and roll call settings; the words most often used were "motherfucker" and "blank";

2.    The word "blank" is a substitute for the "n" word;

3.    Turner made many requests to Rock that he desist the derogatory names;

4.    Upon greeting Lt. Rock with "good morning," Rock responded with: "Everett, sit the fuck down and shut the fuck up;"

5.    The clipboard incident wherein Rock grabbed the clipboard from Turner's hands, threw it to the ground spilling all the papers, and then accused Turner of being a thief;

6.    Lt. Rock's statement at roll call that Turner and his partner Curry were "fucking up on and off the job."

7.    Lt. Rock's use of the "n" word while relating a story at roll call.

15

As we will set forth in Argument II, *infra*, if all or most of these elements are met, Plaintiff will have set forth a *prima facie* case for racial discrimination. Based upon the record at hand, however incomplete (because of Defendant's apparent failure to submit key documents), there are genuine issues of material fact raised as to each of these elements of Plaintiff's racial discrimination claim.

(1)     As to the continual use of the derogatory terms, there is an open conflict between Turner and Rock. Turner has stated by way of his Complaint and his affidavit that this was a continual occurrence from shortly after the time that Officer Turner began working in F Platoon under Lt. Rock in 2001. (Tab A). Although there may have been a couple of initial months without these derogatory terms, the terms were a substitute for Turner's name which was not used by Rock since the mid-part of 2001. *Id.* Rather, Lt. Rock substituted Turner's name with the words "motherfucker", "blank" or "dumbass". (*Id.*; Tab C). Rock testified in his Department of Labor affidavit that he never used curse terms or the word "blank" directed specifically at any officer, including Corporal Turner. (Tab R). WPD's Internal Investigation found to the contrary that, "[s]everal officers on F squad verified that Lt. Rock used the word 'motherfucker' and 'blank' while addressing officers." (Tab O). Paragraph 8 of Defendant's Answer admits that Rock may have called Plaintiff a "blank". *Id.* However, in Lt. Rock's statement to the Office of Professional Standards, he stated that he never used the word "blank directed to Turner or any other officer." This statement found in the Appendix at A-108 is not verified.

(2)     Plaintiff has produced five affidavits including one from the officer who originated the term "blank". (Tabs A, B, C, D and E). Officer Eric Green testified that he began to use the word within WPD to substitute for the "n" word. (Tab B). Defendant

16

has produced affidavits from other Wilmington Police Officers who were asked to define the word "blank". (A-50 through A-95). All agreed that it is a derogatory term. *Id.* However, there was a difference as to the meaning. The affidavits from Defendant stated that "blank" meant as follows: (i) "knucklehead" (Lt. Rock) (A-15); (ii) "loser" (Officer John Burns) (A-69); (iii) "zero" (Officer Michael Gifford) (A-80); (iv) "Defendant" (Officer Alfred Izquierdo) (A-85); and (v) "negative term filled in by the receiver in the communication (Officer Porifirio Alequine) (A-60). Defendant has repeatedly referred to the word "blank" as a "racially neutral" term. *Id.* This is directly refuted by Plaintiff's affidavits which show the origin and use of the word "blank" as a substitute for the "n" word, a racial epithet. (Tabs A, B, C, D and E).

    (3)    Turner made numerous requests for Rock to desist from the demeaning conduct. (Tab A). This was determined to be one man's word against another. (Tab O). Turner states categorically in his affidavit that he made these many requests and was able to cite with particularity the last three requests to desist in November and December of 2003, while Rock testified by affidavit that Turner "never expressed to me that he found the cursing or the use of "blank" offensive, humiliating or disrespectful at any time." (Tab A, Tab R). Rock also previously testified by affidavit that he was "shocked" to receive Turner's complaint, believing that he and Turner had a "very good working relationship." (Tab R). Rock testified by affidavit that he received notice that Turner filed his January 26 complaint on February 17, 2004. (Tab R). However, the record reflects that the Internal Investigation of Turner's January 27 complaint was begun and substantially completed in the first week of February 2004. (Tab O).

(4)     Turner greeted Rock who then told Turner to "sit the fuck down and shut the fuck up." (Tab A). Rock testified by affidavit that "[w]hen an officer, including Cpl. Turner, greets me with "good morning" or "how are you today," I have never responded by cursing them or by telling them to "shut the f--- up." (Tab R). Despite Rock's denial, the Internal Investigation found that this statement was substantiated by Officers Lynch and Curry. (Tab O). The statements from Officers Lynch and Curry were not provided by Defendant as part of the document production in this matter.

(5)     Turner's clipboard was grabbed from him by Rock and thrown to the floor scattering his papers. (Tab A). Plaintiff testified that he felt physically threatened as a result of this incident. *Id.* The Internal Investigation appears to have corroborated this incident but was dismissed by Inspector Wright as being a joke. (Tab O). Wright found that Rock had "busted" on Turner. *Id.* Wright acknowledged that several officers were present at roll call and recall this incident. (Tab O). However, there was no acknowledgement of this in the documents produced by Defendant.

(6)     Lt. Rock accused Turner and his partner of "fucking up, on and off the job." (Tab A). The Internal Investigation found that this claim could not be substantiated. (Tab O). Inspector Wright found that "Lt. Rock does not recollect this incident and I cannot corroborate this through the submitted reports." (Tab O). However, Officer Robert Curry, Turner's partner at the time of this incident, filed an affidavit acknowledging that he did recall the incident as set forth by Turner in his Complaint. (A-78).

(7)     Lt. Rock used of the "n" word during roll call. (Tab A). This incident was universally acknowledged by officers who submitted their Investigation

18

Questionnaires. (Tab O). These officers, as well as Inspector Wright, determined that there was no problem with Lt. Rock's use of this word. *Id.* Wright determined that this claim was "unfounded." *Id.* Wright's rationale was that "Lt. Rock used the word 'n [abbreviation]' in a past incident with a defendant and he was merely quoting the defendant." *Id.*

The evidentiary conflicts with regard to each of the elements set forth by Plaintiff in his initial January 26, 2004 letter as well as the Complaint filed in this Court, must preclude Defendant from obtaining summary judgment. In addition, the record demonstrates that Defendant has failed to produce (for reasons unknown) at least six Departmental Information Reports from F Platoon officers. Further, Plaintiff is responding to Defendant's Motion without the benefit of having Plaintiff's personnel file which has still not been received from Defendant. (Tab H).

Defendant's argument that Plaintiff cannot establish *respondeat superior* is misplaced. The evidence produced by Plaintiff by way of affidavits and Plaintiff's deposition shows that the use of the term "blank" substituting for the "n" word was often used in the Wilmington Police Department. Further, as the evidence suggests, the most severe harassment lodged against Plaintiff by Lt. Rock occurred in front of F Platoon during roll call. WPD was put on notice by these actions and had ample opportunity to stop the harassment by Lt. Rock. Instead, after Plaintiff filed his internal complaint the Internal Investigation culminated with a slap on the hand of Lt. Rock for using rude and insulting language.

The United States Supreme Court has held that if a supervisor creates a hostile work environment, liability turns on whether the supervisor's acts are "official" or

19

"unofficial". *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). In this matter, there is no suggestion that Rock's conduct was done outside the workplace or outside the scope of his employment. Here, the City argues disingenuously that Rock's conduct does not "arise from a misuse of Lt. Rock's managerial authority." Obviously, the City has misconstrued the facts to suggest that Rock's conduct was not a misuse of his managerial authority.

Plaintiff respectfully submits that the outright inconsistencies and contradictions as well as Defendant's failure to produce all documents that it acknowledged in its investigation must preclude summary judgment.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome under the governing substantive law. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A dispute over a material fact must be "genuine", *i.e.*, the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

To survive a motion for summary judgment, Defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

In the present matter, the current record, together with the affidavits establishes that there are several genuine issues of material fact. Therefore, Defendant is not entitled to summary judgment as a matter of law.

## II.    PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CLAIM OF RACIAL DISCRIMINATION BY WAY OF HOSTILE WORK ENVIRONMENT.

Defendant's approach to its argument suggesting that Plaintiff has not brought forth a valid claim of hostile work environment is premised on an examination of each of the various points of discrimination raised by Everett Turner in his initial complaint to his superiors as well as his subsequent complaints to the Delaware Department of Labor and the Complaint filed in this Court. What Defendant fails to recognize is that such a determination of a hostile work environment must depend upon the "totality of the circumstances." *Seldomridge v. Uni-Marts*, 2001 U.S. Dist. LEXIS 9491 (D. Del. 2001). Plaintiff respectfully argues that the long course of demeaning and racially hostile behavior exhibited by Lt. Rock toward Plaintiff easily satisfies the criteria for a hostile work environment underlying racial discrimination.

Lt. Rock acknowledged that he began working with Corporal Turner in April 2001. (Tab C). They continued to work together on F Platoon with Rock being the Operations Supervisor until Plaintiff's departure from the Wilmington Police Department. (Tab A). Turner's last day of active service was January 26, 2004. *Id.*

21

During that time, less the first couple of months when they worked together and also less two or three months when Lt. Rock attended the FBI Academy, Plaintiff was continually harassed by Lt. Rock. (Tab A). Rather than use Plaintiff's first name, or even his last name, Rock continued to refer to him as "motherfucker", "blank" or "dumbass". (Tab A, Tab C). Plaintiff took particular offense to the word "blank" because he knew what that word meant. (Tab A). This was a word introduced to the Wilmington Police Department by Officer Eric Green in the late 90's and was used to substitute for the "n" word. (Tab B). The use of the word "blank" was well known throughout the Wilmington Police Department. *Id.*

Rock not only used offensive names toward Turner but he was verbally and physically abusive in other means. Plaintiff approached Rock on several occasions in private asking Rock to cease and desist the derogatory name calling. (Tab A). Rock's usual response was "yeah, motherfucker, right" and then he would walk away. (Tab A). Plaintiff had frequent contact with Rock usually seeing him eight to ten times each week. (Tab A).

In the fall of 2003, the strained relationship between Rock and Turner deteriorated further. At one point during a roll call, Rock used the "n" word in recounting a story as to what a prisoner had said. (Tab A). When Rock recounted the story, he looked up specifically at Everett Turner.

Turner continued to serve as a subordinate to Rock and treat him with respect. On one occasion when Rock walked into the room, Turner greeted him with "Good morning Lt. Rock, how are you doing?" Rock's response was "Everett, sit the fuck down and shut the fuck up." (Tab A). Rock also during a roll call singled out Turner and his partner,

22

Curry, and told the assembled crowd that they were "fucking up both on and off duty." *Id.* In a display of physical force, Rock grabbed a clipboard from Turner's hands, throwing it down on the floor and scattering all of Turner's papers. *Id.* Rock followed that by asking Turner in front of everyone "How do you like that, motherfucker, fucking thief." *Id.*

In order to be actionable, a hostile work environment must be "sufficiently severe or pervasive ." Given that this conduct of Rock toward Turner continued for a period of approximately 2 ½ years, this must be considered pervasive. This issue has been addressed by the Third Circuit in *Zelinski v. Pennsylvania State Police*, 2004 U.S. App. LEXIS 21235 (3d Cir. 2004). In *Zelinski*, the Court held that the alleged incidents that contributed to the hostile work environment occurred over a period of slightly more than a year and they were deemed to be pervasive or certainly that there was a material issue of fact as to whether the Plaintiff was exposed to a severe or pervasive hostile work environment.

Defendant has attempted to isolate Rock's bad conduct and to minimize it by ignoring the inconsistencies that were shown in our Argument I, *supra*. For example, Defendant argues that there is a "singular quotation of the racial epithet." This flies in the face of the evidence produced by Plaintiff in this matter, namely wherein the continual use of the word "blank" by Rock amounted to a racial epithet every time it was used.

Moreover, Defendant did not acknowledge anywhere in its briefing that it accepted without any apparent objection, Plaintiff's claims set forth in his worker's compensation petition. Defendant's response to Plaintiff's claim was to accept the claim

23

as submitted by Plaintiff Everett Turner. Plaintiff respectfully suggests to the Court that Defendant has acknowledged the harassment that produced Plaintiff's injuries.

The conclusion of the Internal Investigation instigated by Plaintiff's complaints found that there was no discrimination towards Plaintiff or his fellow officers. (Tab O). Such a finding cannot be given any credence given the substantial conflict in the facts presented.

Plaintiff has set forth a *prima facie* claim of racial discrimination. The elements are as follows:

1.    He is a member of a protected class;

2.    He was treated differently than persons similarly situated but of a different background;

3.    The discrimination resulted in a tangible employment action; and

4.    The City did not have a legitimate, non-discriminatory reason for its actions.

*McDonnell-Douglas v. Green*, 411 U.S. 792 (1973).

The evidence produced by Plaintiff and by Defendant, for that matter, shows that Plaintiff has satisfied each element. As an African-American, Plaintiff is a member of a protected class and the extended demeaning treatment by Lt. Rock wherein a racial epithet or its known substitute was continually used by Rock against Plaintiff. This discrimination resulted in a tangible employment action necessitating Plaintiff's request for stress leave and the approval from WPD. Indeed, Plaintiff's worker's compensation petition articulated the reason for his leaving work and this was agreed to by WPD when they signed the Agreement for worker's compensation allowing Turner to get total

24

disability benefits. Lastly, the conduct of Rock in this manner was so egregious that there can be no consideration that Defendant had a legitimate, non-discriminatory reason for the allowance of Rock to treat Plaintiff in such a hostile manner.

## III.    PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CASE FOR RETALIATION.

The claim for retaliation is much more simple and direct than acknowledged by Defendant in its Opening Brief. Plaintiff filed the claim charging discrimination by way of hostile work environment on January 26, 2004. In early February 2004, Plaintiff's superiors, who were in receipt of Turner's complaint, approved a transfer of Plaintiff from F Platoon back to a patrol position. Plaintiff thrived in the environment of community policing which was only available in F Platoon and he would not have an opportunity to do same in the patrol division. Plaintiff testified by affidavit that he loved community policing and wanted to continue to work in that capacity. (Tab A).

The elements that Plaintiff must establish for a *prima facie* case of retaliation are as follows:

1.    He engaged in protected employee activities;

2.    The City took an adverse employment action against him, after or contemporaneously with his protected activity;

3.    A causal link existed between the protected activity and the City's adverse employment action.

*Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173 (3d Cir. 1999).

There is no question that Turner's complaint addressed to Chief Szczerba dated January 26, 2004 was protected employee activity. (Tab I). Defendant has rather

25

focused on the second element, that of adverse employment action. Upon Plaintiff's return to active duty (which unfortunately never occurred) he would have been transferred from F Platoon. (Tab J). The orders to transfer Plaintiff were set forth on a memorandum signed by Lt. Rock's supervisors, Captain Marlyn Dietz and Inspector James Wright. *Id.*

The question is whether a transfer from F Platoon to patrol is considered an adverse employment action. This issue has been addressed and the Court determined that such a transfer would constitute adverse employment action. The Third Circuit has determined that "adverse employment action" under Title VII is satisfied where a plaintiff police officer claimed that a patrol assignment was less desirable than the detective bureau even though plaintiff did not lose his pay or rank as a result of his transfer. *Hampton v. Bureau of Tinton Falls Police Department*, 98 F.3d 107, 115-116 (3d Cir. 1996).

Lastly, there is a "causal link" between Plaintiff's letter and the adverse employment action. The evidence shows that the letter from Plaintiff dated January 26 was not received by Defendant until January 27. (A-249). Within the next two weeks, both Captain Dietz and Inspector Wright signed off on this transfer. (Tab J). Inspector Wright headed the Internal Investigation done as a result of Plaintiff's complaint. *Id.* Captain Dietz noted that in this interval he had spoken with Lt. Rock "regarding these moves." *Id.* Dietz was advised that Turner was being transferred "due to performance" and to "keep F Platoon providing the highest level of performance." *Id.*

The notion of performance appears to be a pretext. The only suggestion of performance issues came from affidavits from Officers Gifford and Curry. (A-78

26

through A-81). The affidavit of Reginald Harvey testified that Officer Gifford is

unreliable and has submitted falsified police reports. (Tab E). The statements of Officers

Curry and Gifford in their affidavit were refuted by Plaintiff in Plaintiff's affidavit. (Tab

A).

It is respectfully submitted that Plaintiff has set forth a prima facie case of

retaliation in response to his claim of a racially hostile working environment.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully request that this

Honorable Court deny Defendant's Motion for Summary Judgment.

Dated: September 18, 2006                    **MARGOLIS EDELSTEIN**

Jeffrey K. Martin Esquire (DE-2407)
1509 Gilpin Avenue
Wilmington, DE  19806
(302) 777-4680
Attorneys for Plaintiff