IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KENNETH A. BOYD,      :
            :
  Plaintiff,      :
            :  C.A. No. 05-178 (KAJ)
v.           :  TRIAL BY JURY DEMANDED
            :
CITY OF WILMINGTON,    :
            :
  Defendant.      :

**PLAINTIFF'S REPLY TO DEFENDANT'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR A NEW TRIAL**

I.  **The Jury Selection Process of This Court has Denied Plaintiff the Right to Have a
Jury Selected at Random From a Fair Cross-Section of Delaware.**

Plaintiff's Motion for New Trial is based upon both his statutory and constitutional right

to have a jury selected at random from a fair cross-section of Delaware.  The elements for

establishing a prima facie violation of the fair cross-section requirement of the Act and the

Constitution are identical. Duren v. Missouri, 439, U.S. 357, 364, 58 L. Ed 2d 579, 99 S. Ct. 664

(1979).

First, Plaintiff is alleging that minorities, specifically, African Americans, a distinctive

group in the community, is excluded from the jury selection process.

Second, Plaintiff contends that the representation of African Americans in jury venires is

not "fair and reasonable" in relation to the number of such persons in the community.

Unfortunately for Plaintiff, information concerning the number of minorities in the jury venire

for this case is not readily available during the briefing of this motion. However, Professor

Ilvento, a University of Delaware Professor with extensive experience with self-administered

surveys, has provided evidence that the nonresponse rate in self-administered surveys for African

Americans is nearly double the rate for White Non-Hispanics. (Ilvento Affidavit). Defendant has not disputed this evidence. The jury selection field is severely narrowed and in the absence of countervailing proof, this enhances the likelihood that the smaller segment is not truly representative of a fair cross-section of the community. Broadway et al. v. Culpepper, 439 F.2d 1253, 1257 (5th Cir. 1971). A low rate of response to juror questionnaires could lead to the underrepresentation of a group that is entitled to be represented on the qualified jury wheel. U.S. v. Gometz, 730 F. 2d 475, 478 (7th Cir. 1984).

To have a sample jury pool that is representative of a cross-section of the community the rate of return for the questionnaire form should be at a rate of 50% or greater to avoid the risk of obtaining a biased sample with fewer minorities. (Ilvento Affidavit). A significant disparity between the demographic patterns in a community and the relative percentages of each cognizable, distinct demographic group on the jury lists may warrant corrective action by a federal court. Castaneda v. Partida, 430 U.S. 482, 494 (1977). It is also clear from the cases dealing with racial discrimination in the selection of juries that the systematic exclusion of African Americans is itself such an 'unequal application of the law...as to show intentional discrimination.' Alexander v. Louisiana, 405 U.S. at 632, 92 S. Ct. 1221.

Defendant attempts to discount the evidence proffered by Professor Ilvento as not sufficient, reliable or relevant. (Def's Mem. at 8). According to Defendant, Professor Ilvento bases his "attenuated assumption" on the 1990 Census mail response rates for minorities. Id. However, Professor Ilvento has extensive experience with respect to self-administered surveys and his opinion is based on his research of self-administered surveys like the Jury Questionnaire Form. (See Ilvento Affidavit). Both the Census Bureau survey and the Jury Questionnaire Form are federal forms sent to citizens by the U.S. Government with the mandate that they be promptly

returned. Thus, the aforementioned case law, the 1990 Census mail response rate for minorities, along with Professor Ilvento's affidavit support Plaintiff's contention that a low rate of response by African Americans to juror questionnaires has lead to the underrepresentation of this group that is entitled to be represented in the jury pool.

Third, this underrepresentation of minorities, specifically African Americans, is caused by the systematic exclusion of African Americans in the jury selection process. It is not the result of African Americans choosing to exclude themselves from the process as Defendant wrongly suggests. (Def's Mem. at 9). No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status. U.S. v. Brummitt, 665 F. 2d 521, 528 (5th Cir. 1981). It is clear from the cases dealing with racial discrimination in the selection of juries that the systematic exclusion of African Americans is itself such an 'unequal application of the law…as to show intentional discrimination.' Alexander v. Louisiana, 405 U.S. at 632, 92 S. Ct. 1221.

The court may exact from officials responsible for the construction of jury lists a high standard of comparability between demographic percentages and those of the jury list. Berry v. Cooper, 577 F. 2d 322, 327 (5th Cir. 1978) (holding that that jury commissioners failed to make any attempt to follow up on undelivered or unreturned questionnaires to minimize or reduce this disproportionate result). As such, this Court has a responsibility to ensure that African Americans are not systematically excluded from the juror selection process so that African Americans are not denied the constitutional right to have a jury selected from a fair cross section of the community.

Defendant contends that the information upon which Plaintiff bases his Motion is information that was readily available to him prior to the commencement of trial (Def's Mem. at 3). Newly discovered evidence is "evidence of facts in existence at the time of trial of which the aggrieved party was excusably ignorant. Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir. 1991). Under Federal Rule of Civil Procedure 59, newly discovered evidence may justify a new trial if such evidence 1) is material and not merely cumulative, 2) could not have been discovered prior to trial through the exercise of reasonable diligence, and 3) would probably have changed the outcome of the trial. Farm Credit Bank v. Guidry, 100 F.3d 1147, 1154 (5th Cir. 1997).

In any case, a plaintiff has the right to a jury of one's peers meaning a fair cross-section of the community in which the case is to be tried. The information undersigned counsel obtained concerning the Court's jury selection process constitutes "newly discovered evidence" warranting a new trial pursuant to Federal Rule of Civil Procedure 59. Undersigned counsel has learned through the exercise of due diligence that 1) the response rate for the Jury Questionnaire Form is between only 10% and 12%. (Martin Affidavit); and 2) the process of selecting jurors based solely upon whether the juror responds to the single Jury Questionnaire form creates a bias with minorities, specifically African-Americans, being significantly underrepresented in the sample jury pool. (See Ilvento Affidavit). This evidence could not have been discovered prior to the trial because undersigned counsel had no reason to question the jury selection process. Undersigned counsel was excusably ignorant to the fact that the response rate for African Americans is drastically low and also to the fact that this low response rate has a profound and negative impact on obtaining a sample jury pool representative of Plaintiff's peers in the community.

4

This information was not *readily* available to undersigned counsel as Defendant errantly suggests. (Def's Mem. at 3). Although the Jury Plan is posted on the Court's web site, the Plan does not indicate that only 10% to 12% of the questionnaire forms are returned to the Court. It was not until after the apparent reluctance of Juror No. 5 to agree with this verdict that undersigned counsel had reason to question whether the jury venire was representative of the population for the State of Delaware. Thus, undersigned counsel had no reason to question the response rate until prompted to inquire because of Juror No. 5's reluctant response. Immediately after these observations and with due diligence, undersigned counsel explored the Jury Plan for this District and also spoke with Jury Administrator John Trickey.

Defendant asserts that there was no reluctance which could be detected in Juror No. 5's answer when she was polled. (Def's Mem. at 4). However, this contention is disingenuous at best. It was more than evident that Juror No. 5 could only whisper her response when asked if she agreed with the jury's verdict in favor of the City of Wilmington. Surely, the information provided by Plaintiff by way of an affidavit offers a glimpse into Juror No. 5's state of mind during both the deliberation and polling process.

Notwithstanding Plaintiff's affidavit, Defendant contends that Plaintiff failed to submit an affidavit from Juror No. 5 herself and therefore, Plaintiff's affidavit is hearsay. (Def's Mem. at 4).[1] Juror No. 5 submits by way of an affidavit that she was intimidated and coerced into exiting the jury deliberation room. (See Juror No. 5's Affidavit). What is more important, Juror No. 5 testifies that the jurors did not reach a *unanimous* verdict. Id. She voted for Plaintiff and the other 8 jurors voted for the City of Wilmington. Id. She reluctantly agreed to come out of the

[1] Last evening, undersigned counsel discovered by way of affidavit from Juror No. 5 (a copy of this affidavit is attached hereto, as Exhibit A) that a unanimous verdict was not reached by the jury of nine. Upon receipt of this information, undersigned counsel immediately sent a letter to this Court to bring this information to the Court's attention and to request a teleconference to discuss the ramifications of this Juror's affidavit (a copy of this letter is attached hereto, as Exhibit B).

jury deliberation room because she was intimidated and did not feel that she could convince the other jurors by herself. Id. She was not aware that the jurors' decision had to be unanimous. Id. She spoke very softly when polled because she was nervous, uncomfortable and very reluctant to say that Plaintiff was *not* discriminated against. Id.

Since the creation of the federal judicial system, federal courts have always required that a jury verdict be unanimous. Johnson v. Louisiana, 406 U.S. 356, 382-83, 92 S. Ct. 1620, 1644. This historical requirement of unanimous jury verdicts in federal courts applies not only to criminal trials, but also to civil cases. Id. at 369. Thus, Plaintiff, as a litigant in Federal court, was denied the rights to both a trial by a jury selected at random from a fair cross-section of the community and a jury whose decision was unanimous.

The sample jury pool from which juries are selected by this Court is not fair and reasonable in relation to the number of minorities, specifically African-Americans, in the community. As such, Plaintiff has been denied the opportunity of having a petit jury selected at random from a fair cross-section of the community in the district where this Court convenes. Therefore, Plaintiff requests a new trial so that he may exercise his constitutional right to have a unanimous verdict and his right to have his case heard before a jury that is drawn from a source that is fairly representative of the community.

**II.     The Court's exclusion of Plaintiff's questioning of Lt. Rock on his repeated use of the word "blank" was an error that unfairly tied Plaintiff's hands and prevented Plaintiff from presenting his case.**

In their reply, Defendant contends that the Court properly excluded undersigned counsel's requested impeachment of Lt. Rock regarding his repeated use of the word "blank," a euphemism for the "n" word. (see Ex. 1)[2]. Defendant contends that the requested impeachment of Lt. Rock regarding his repeated, public, and open use of that racial epithet, directed at minority officers, was both irrelevant and unfairly prejudicial.   Defendant's arguments are without merit. The proposed impeachment of Lt. Rock would have been highly probative in establishing:  (1) the racial climate in the Wilmington Police Department; and (2) the racial bias and overall credibility of the witness, Lt. Rock.

In their reply, Defendant enumerates five reasons which they argue demonstrate that undersigned counsel's proposed line of questioning "would have been unfairly prejudicial to the Defendant." (Def's Mem. at 11).  In summary, Defendant argues as follows: (1) Lt. Rock does not dispute using the word "blank," but rather contends the term is "racially neutral" and thus irrelevant in showing racial bias; (2) Lt. Rock has never admitted that the word "blank" is code for the "n" word; (3) alternatively, Lt. Rock's conduct is irrelevant because Lt. Rock has not been accused of directly participating or engaging in any discriminatory conduct specifically directed toward Plaintiff; (4) because Lt. Rock is not Plaintiff's direct supervisor, Lt. Rock has no power over Plaintiff's career; (5) although Lt. Rock testified about  discussions which took place in high level meetings with the Chief, relating to the promotion process, Lt. Rock had no

---

[2] Exhibit 1 contains an affidavit prepared by Officer Eric Green and offered by Plaintiff Everett Turner in <u>Turner v. City of Wilmington</u>, C.A. No. 05-716 (GMS).  Officer Green's affidavit speaks to the definition of the term "blank" within the City of Wilmington Police Department.

input into promotion decisions and thus, evidence of Lt. Rock's racial bias is irrelevant. (Def's Mem. at 10).

As previously mentioned, Defendant asserts that because Lt. Rock claims "blank" is a racially neutral term, it was properly excluded as irrelevant toward demonstrating racial bias. Id. However, Lt. Rock's assertion is contradicted by the affidavits of other officers in the department. Officer Eric Green, who has used the word "blank" for the past six years as "a means of substituting the 'n' word" adds that "[blank] is not a racially neutral word and never has been." (see Ex. 1). Thus, it has not been established that "blank" is a racially neutral term.

Testimony regarding Lt. Rock's use of this term is relevant to demonstrate Lt. Rock's racial bias because it has not been shown that the word is racially neutral, despite the fact that Lt. Rock suggests it is racially neutral. Furthermore, the Third Circuit Court of Appeals has previously recognized terms such as "all of you," "that one in there," and "one of them" as potential euphemisms or code words for "discriminatory animus." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996); Abramson v. William Patterson College, 260 F.3d 265, 278 (3d Cir. 2001).

As outlined above, Defendant asserts that because Lt. Rock was neither Plaintiff's direct supervisor, nor a named Defendant, nor a participant in the promotion process, testimony about Lt. Rock's use of the word "blank" is irrelevant and thus properly excluded. (Def's. Mem. at 10). In support of this argument, Defendant cites two cases Joseph v. Publix Super Markets, Inc., 151 Fed. Appx. 760, 769 (11th Cir. 2005); Figures v. Board of Public Utilities of the City of Kansas City, 967 F.2d 357 (10th Cir. 1992). Defendant's reliance on the above cases is misguided as they are readily distinguishable from the instant matter. In Joseph, the court held that testimony given by the plaintiff regarding a former supervisor's use of the "n" word was

properly excluded because the supervisor had retired prior to and played no role in the alleged discrimination. Joseph, 151 Fed. Appx. At 760. Thus, the supervisor's use of the "n" word was irrelevant because the bias of the supervisor had no connection to the discrimination at issue and therefore had no bearing on the case. Id. This case is distinguishable from the instant matter in several ways and, as such, Lt. Rock's racial bias is of great consequence in the instant matter. First, Lt. Rock was employed during the alleged discrimination; Second, unlike in Joseph, Lt. Rock offered testimony at trial; Third, Lt Rock's prior use of racial epithets would have been offered not only as proof of the ultimate issue but more importantly it would have been used to impeach Lt. Rock's credibility and demonstrate his racial bias. Id.

As in Joseph, the testimony in Figures was not offered for impeachment purposes. Figures, 967 F.2d at 357. Thus, the court's analysis in Figures is of little consequence in the instant matter. Id. Furthermore, neither case was set in a paramilitary organization such as a police department, where every officer has authority over all other officers who are below him in rank, even if they do not report to him directly, as is the case with Lt. Rock and Sergeant Boyd.

Lt. Rock's testimony was therefore, improperly excluded for the following reasons: (1) Lt. Rock was employed during the alleged discrimination; (2) Lt. Rock by virtue of his rank is in a position of power over Plaintiff; (3) Lt. Rock has personal inside knowledge about the promotion process; (4) Lt. Rock testified at trial and should have been subject to cross-examination about his potential racial bias.

Undersigned counsel respectfully submits that the Court's refusal to allow impeachment of Lt. Rock regarding his use of the word "blank" effectively deprived Plaintiff of the right to "effective cross examination" by preventing Plaintiff from eliciting testimony from Lt. Rock

9

about his racial bias and thus prevented the jury from hearing information they needed "to

properly evaluate [the] witness." Douglas v. Owens, 50 F.3d 1226, 1230 (3d Cir. 1995).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that this Court grant his Motion for a New Trial.

**MARGOLIS EDELSTEIN**


/s/ Lori A Brewington
Jeffrey K. Martin (Del. Bar No. 2407)
Lori A. Brewington (Del. Bar No. 4522)
1509 Gilpin Avenue
Wilmington, DE  19806
(302)-777-4680
*Attorneys for Plaintiff*
*Kenneth A. Boyd*